NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

14-P-579                                              Appeals Court

IN THE MATTER OF THE ESTATE OF CHARLES P. GALATIS.

No. 14-P-579.

Middlesex.      April 14, 2015. - September 9, 2015.

Present:  Berry, Milkey, & Massing, JJ.

Will, Testamentary capacity.

Petition for probate of will filed in the Middlesex Division of the Probate and Family Court Department on June 12, 2000.

The case was heard by Maureen H. Monks, J.

Dimitrios Ioannidis for town of Skiathos.
William M. Driscoll for Syriano Kyparissou Kontos & others.

MILKEY, J.  On January 15, 2000, Charles P. Galatis, then seventy-six years old, was admitted to Massachusetts General Hospital (MGH).  Once admitted, he was diagnosed with stage IV lung cancer, and over the ensuing weeks he suffered a rapid

overall decline in his physical and mental condition. Galatis remained hospitalized,[1] and he died on February 25, 2000.

On February 9, 2000, Galatis executed a document purporting to be his will. The executor named in the will formally presented it for probate, joined by the will's principal beneficiary, the town of Skiathos, Greece.[2] Two of the decedent's cousins contested the will. After a ten-day trial, a Probate and Family Court judge declined to allow the will, because she found that Galatis lacked testamentary capacity on February 9. Because that finding is amply supported by record evidence, we affirm.

Background. The judge made 559 factual findings that totaled seventy-one pages. We summarize those findings, almost all of which are unchallenged, and highlight the facts still in dispute. See Rempelakis v. Russell, 65 Mass. App. Ct. 557, 559 (2006).

---

[1] On February 2, 2000, Galatis was transferred from MGH to Spaulding Rehabilitation Hospital (Spaulding). On February 6, he was readmitted to MGH after developing renal failure and a urinary tract infection.

[2] The decedent was born in Skiathos in 1923. He was an only child and had no children, and his wife of thirty-three years died from lung cancer in 1995 or 1996. He was survived by his cousins, George Kyparissos, Charalambos Kyparissos, and Athena Perisiadou. During the pendency of the probate of Galatis's estate, Charalambos Kyparissos died and his heirs-at-law were substituted for him.

1.  <u>Galatis's background medical conditions</u>.  By the time Galatis was admitted to MGH, he already suffered from a long list of medical problems including diabetes, hyperkalemia (excess potassium in the blood), and major depression.  For such problems, Galatis was taking twelve different prescribed medications, including the antidepressant Elavil, and two different narcotics for pain relief.  The symptoms of anxiety and depression worsened following his diagnosis with metastatic lung cancer.  He therefore was prescribed a second antidepressant, and the dosages for both antidepressants subsequently were increased.  His painkillers also were aggressively increased, and he was placed on a self-administered morphine drip beginning on February 8.

2.  <u>The February 1 document</u>.  When he entered MGH, Galatis apparently had no existing will.  At some point during his initial hospitalization, he asked a friend, Steven Damaskos, to record his thoughts regarding the disposition of his property.  Damaskos wrote down individual names that Galatis provided to him, followed by specific amounts of money they were to receive.  Damaskos then transcribed the information onto a will template form he found through an Internet search, and Galatis signed the resulting document on February 1, 2000.  As discussed below, although the February 1 document was admitted in evidence at the

trial on the February 9 will, it was not itself offered for probate prior to the conclusion of that trial.

3. Differences between the February 1 document and the February 9 will. An attorney brought in by Damaskos to prepare a proper will for Galatis was given the February 1 document as a starting point. The end product was the will executed by Galatis on February 9, 2000. The estate plan delineated in that will is similar in most material respects to that contained in the earlier document. Both documents provided for the creation of a charitable trust administered by a foundation in Skiathos, the corpus of which would consist of Galatis's real estate assets in Greece. Unsurprisingly, the later document drafted by the attorney generally is a more developed product than the earlier one produced by Damaskos, and many of the differences could best be described as refinements or minor modifications to the earlier plan. For example, the February 9 will provided for the disposition of certain personal property not enumerated in the February 1 document. However, the February 9 will also included some curious additions and omissions. The will included one beneficiary who -- according to uncontradicted testimony -- apparently does not exist, and the residuary clause included in the February 1 document was omitted (even though --

again, according to uncontradicted testimony -- the will did not otherwise dispose of all of Galatis's estate).[3]

4. The events of February 8, 2000. Sometime in the late afternoon of February 8, 2000 (the day before the will signing), Galatis was administered a dose of Ativan for his anxiety symptoms. Apparently as a result of an adverse reaction to the Ativan, Galatis became somnolent and developed a facial droop. He exhibited slurred speech, drowsiness, and inability to pay attention, and he required constant stimulation to generate answers to questions. After it was observed that his arms were flopping, he was diagnosed with asterixis, which is indicative of central nervous system impairment. These symptoms also led to Galatis being diagnosed with the underlying brain condition encephalopathy.

5. The extent of Galatis's temporary recovery. On the evening of February 8, Galatis was given a drug to try to reverse the effects of the Ativan. Both sides agree that the administration of this drug (the antidote) had some beneficial effects. They differ sharply, however, on the import of the

---

[3] Additionally, although both documents provided that Skiathos would be the beneficiary of a trust funded by Galatis's real estate holdings there, the February 9 will added that his home in Skiathos be converted into a museum and never be sold. At the same time, the February 9 will -- unlike the February 1 document -- would grant the executor a power of sale of real property, thus obviating the need for him or her to seek court approval before selling the Skiathos house. See Samra v. Yuan, 40 Mass. App. Ct. 934, 935-936 (1996).

Ativan episode with regard to Galatis's mental state when he signed the will the following day. The will proponents sought to portray the administration of the antidote as allowing Galatis to make a dramatic recovery through which he regained sufficient capacity to execute the will. The will contestants asserted that while the reaction to the Ativan may have exacerbated Galatis's mental condition on February 8, he by that time was already suffering from encephalopathy, which was impairing his cognitive and motor functions.

6. The will contestant witnesses. The will contestants supported their case with expert opinion testimony from Dr. Marc Whaley, a forensic psychiatrist. Dr. Whaley testified from his review of the medical records that Galatis had exhibited symptoms of encephalopathy (albeit less severe) in the days prior to the Ativan reaction.[4] He also opined that even though Galatis may have shown some improvement through the administration of the antidote, the underlying encephalopathy would not have abated. According to him, a person with encephalopathy suffers from a loss of ability to communicate, remain oriented, think logically, solve problems, and remember information.

---

[4] Dr. Whaley testified that the encephalopathy was likely caused by a combination of factors, including the effect of the interactions of the numerous drugs he was taking and electrolyte imbalance from his infection, as well as multiple derangement due to renal failure.

The will contestants also called Dr. John Stoeckle, the attending physician who directed Galatis's care at MGH.  Dr. Stoeckle was particularly well-suited to offer an opinion regarding Galatis's mental capacity because he had served as Galatis's primary care physician for the last fifteen years of his life.  In addition, Dr. Stoeckle had examined Galatis throughout his hospitalization, including multiple times each day on February 6 through 10.  Consistent with the testimony of Dr. Whaley, Dr. Stoeckle opined that Galatis suffered from encephalopathy and that as of February 9, this condition impaired his ability to think clearly, orient himself, speak and communicate, think logically, solve problems, and remember information.

7.  The contemporaneous hospital records.  The hospital records from February 9 (the day Galatis signed the will) provided some fodder for each side.  A nurse's progress note from 6:00 A.M. on February 9 indicates that Galatis had suffered from the effects of Ativan throughout the night and continued to be "weak" and "confused [as] to place."  One of the treating physicians stated in a note from the early afternoon that Galatis had "recovered from last night's events" and "seem[ed] back to baseline."  However, a nurse's note indicated that as of 1:00 P.M., although Galatis was oriented to himself, his whereabouts, and the time, he complained of "general confusion."

In addition, a social worker who met with Galatis at 2:00 P.M.
on February 9 noted that he was "[d]ifficult to interview
because of mental status changes," and a nursing note at 7:00
P.M. stated that, although Galatis's condition had improved from
the previous day, he continued to be "sleepy" and "confused" at
times.  Assessing Galatis's mental state when the will was
signed on February 9 against the backdrop of the medical records
was made particularly challenging by the fact that no testimony
or other evidence established at what time that day the signing
actually took place.[5]

   8.  The will proponents' witnesses.  The will proponents
offered the testimony of the attorney who drafted the February 9
will.  Although she attended the will signing, she had no
personal recollection of when it was signed, nor could she
produce any contemporaneous notes of the event.  She did testify
that, in her opinion, Galatis was of "sound mind" at the time he
signed the will, but the judge discounted such testimony due to
the fact that she lacked any records of ever meeting with
Galatis alone at any point prior to the will execution, her
"defensive demeanor" while testifying, and the fact that her

---

[5] On appeal, the will proponents argue that it can be
inferred that the will was likely signed sometime between 2:30
P.M. and 7:00 P.M.  A note recorded by Dr. Stoeckle indicates
that Galatis was to receive radiation therapy at 2:30 P.M., and
a nurse's note from 7:00 P.M. says, "Friends here all day.
[Galatis] [d]oes not want to be left alone.  Family members
going over [patient's] legal paper [and] will today."

claim to have met alone with Galatis was contradicted by that of Damaskos (Galatis's friend and the author of the February 1 document).  In fact, the judge sharply criticized the lawyer for failing to inquire at all, at any point prior to the will execution, as to Galatis's mental status or medical diagnosis.

The will proponents also presented the testimony of the two nurses who attested to the will signing.  One had no personal recollection of the will signing whatsoever, and she testified only that her general practice was not to witness a will unless the testator was of sound mind.  The other attesting nurse recalled that Galatis seemed "alert" at the time of the will signing.[6]  In addition, the proponents presented the testimony of Dr. Ernie Paul Barrette, a physician who treated Galatis at MGH. Although Dr. Barrette expressed his opinion that Galatis had testamentary capacity on February 9, such testimony was undercut by several factors:  even though Dr. Barrette was testifying only as a treating physician, not as an expert on testamentary capacity, he had no personal recollection of treating Galatis, and in any event he stopped treating Galatis on February 2.[7]

---

[6] Dr. Whaley and Dr. Stoeckle both explained in their testimony that the term "alert" is a medical term of art meaning only that a patient is conscious and aware of his surroundings, and that the term does not refer to a patient's mental capacity.

[7] The judge did not abuse her discretion in ruling that Dr. Barrette did not qualify as an expert on testamentary capacity. Nor did the judge abuse her discretion in precluding the will

There was also testimony from several friends and family members, many of whom visited Galatis while he was hospitalized. Of the individuals who came to the hospital, only two were present at some point on the day of the will signing, Damaskos and Demetrios Skopas.  Damaskos, although not a blood relative of Galatis, considered him to be like an uncle.  Damaskos visited Galatis at the hospital three or four times a week, and testified in general terms that he found Galatis to be "clear minded" and "able to communicate."  Damaskos was not present at the will signing itself.  Skopas, ninety-one years of age at the time of trial, was a fixture at Galatis's bedside, spending every evening at the hospital and staying overnight approximately fifteen times.  He testified that "he had no difficulty communicating with" Galatis until the day of his death.  However, Skopas also testified that he remained in Galatis's hospital room during the will signing, and this

---

proponents from calling a different witness as an expert based on discovery violations.  As the will proponents accurately point out, even though Dr. Barrette was never qualified as an expert on this, he did -- in response to a question asked on cross-examination -- state his opinion on Galatis's mental capacity on February 9 based on his review of the medical records.  However, the admission of such opinion evidence of course does not mean that the judge was required to credit it.

testimony revealed that he may have had some concern about Galatis's physical and mental condition.[8]

Discussion. 1. Galatis's testamentary capacity on February 9, 2000. As noted, the will proponents formally presented the February 9 will for probate, and thus the trial focused on whether Galatis had testamentary capacity on the date that will was executed.[9] Whether a testator had testamentary capacity is a question of fact. Duchesneau v. Jaskoviak, 360 Mass. 730, 733 (1972). On appeal, "[i]t is our obligation to review the evidence and reach a decision in accordance with our own reasoning and understanding, giving due weight to the findings of the trial judge, which we will not reverse unless they are plainly wrong." Paine v. Sullivan, 79 Mass. App. Ct. 811, 811-812 (2011), quoting from Palmer v. Palmer, 23 Mass. App. Ct. 245, 249-250 (1986). Although there is a presumption that the testator had testamentary capacity, once the contestants produce "some evidence of lack of testamentary capacity, the presumption of [capacity] loses effect" and the

---

[8] During the signing, Skopas asked Galatis to write his signature more clearly, to which Galatis responded, "Leave me alone." After the signing, according to Skopas, Galatis asked him, "I did everything right, right?" Skopas also testified that Galatis seemed "upset" and that "his hand was shaking."

[9] The will contestants also alleged undue influence. The judge rejected that claim and the correctness of her findings and rulings on that point are not before us.

burden shifts to the proponents to prove by a preponderance of the evidence that the testator was able

> "to understand and carry in mind, in a general way, the nature and situation of his property and his relations to those persons who would naturally have some claim to his remembrance[,] . . . freedom from delusion which is the effect of disease or weakness and which might influence the disposition of his property[,] [a]nd . . . ability at the time of execution . . . to comprehend the nature of the act of making a will."

Palmer v. Palmer, 23 Mass. App. Ct. at 250, quoting from Goddard v. Dupree, 322 Mass. 247, 250 (1948).

We agree with the trial judge that the evidence of incapacity summarized above was sufficient to shift the burden of proof to the will proponents, and we discern no clear error in the judge's finding that they failed to carry that burden. There is no merit to the proponents' contention that the trial judge's finding of incapacity was based on evidence of only "general illness and depression."  To the contrary, both Dr. Stoeckle (Galatis's long-term physician) and Dr. Whaley specifically testified that Galatis's diagnosed encephalopathy and myriad medications prevented him from being able to read or understand the provisions of a will on February 9, 2000.  That view also found support in other evidence, such as the contemporaneous hospital records and the marked deterioration in the legibility of Galatis's signature on the will (indicative of significantly impaired motor function associated with

encephalopathy).  To be sure, there was some evidence to support the will proponents' position that Galatis had regained testamentary capacity on February 9 (at whatever time that day he executed the will), but it was the judge's role as fact finder to assess all the evidence and to resolve any conflicts.[10] The record reveals that she carried out her fact-finding duties with uncommon care and comprehensiveness.  In sum, the judge's finding that Galatis lacked testamentary capacity to execute the February 9 will enjoys ample support in the trial evidence.

2.  <u>Status of the February 1 document</u>.  Finally, we are called upon to address a procedural loose end regarding the

---

[10] The proponents suggest that the judge was required to reject Dr. Stoekle's testimony regarding his patient's mental capacity because, in response to a question on cross-examination about whether he understood the term "testamentary capacity," Dr. Stoeckle said, "I think I do not because I don't think I've ever had anyone ask me to do it and I don't remember discussing it with any colleague or lawyer or anybody."  The force of this admission, however, is greatly diminished when it is viewed in the context of the rest of Dr. Stoeckle's testimony. Immediately after acknowledging his lack of familiarity with the legal term "testamentary capacity," Dr. Stoeckle clarified that he understood the concept "in a conceptual way, but not in a[n] operational way."  On redirect, Dr. Stoeckle again clarified that, irrespective of the legal terminology, it was his view that Galatis suffered from "mental impairment and incapacity in comprehending, appreciating, understanding the nature, significance and consequences of the contents and execution of a will . . . ."  In any event, the judge specifically limited Dr. Stoeckle's testimony to his opinion as Galatis's treating physician.  Accordingly, in her findings of fact, the trial judge only considered Dr. Stoeckle's opinion with respect to the degree of Galatis's mental and cognitive impairment; she relied on the testimony of Dr. Whaley as to whether or not Galatis met "the necessary criteria for possessing testamentary capacity."

February 1, 2000, document.  Neither will proponent petitioned to have that document probated as Galatis's will in the event the February 9 will were disallowed.  Hence the trial judge ruled that whether the February 1 document could be considered a valid will was not before her.[11]  Nevertheless, she specifically found that the contestants to the February 9 will did not submit sufficient evidence to overcome the presumption that Galatis had capacity on February 1, 2000, thus raising the possibility that the document that he signed that day could qualify as his will. The will proponents argue that the judge erred in not ruling whether the February 1 document constituted a valid will.  Their argument rests on the premise that a particular procedural step that one of them took sufficed to present the February 1 document for probate.  Assessing the validity of that premise requires additional background detail.

The record shows that, early in the litigation, the proponents of the February 9 will had some confusion about what

---

[11] The governing statute was repealed and replaced during the pendency of these proceedings (something that neither side addresses).  However, both statutes require the proponent of a will to file a petition for probate.  See G. L. c. 192, § 1, as in effect prior to St. 2008, c. 521, § 12 (requirements for filing of petition for probate); Marco v. Green, 415 Mass. 732, 738 (1993) (interpreting G. L. c. 192, § 1, as "requiring" the filing of a petition); G. L. c. 190B, § 3-402(a)(1), inserted by St. 2008, c. 521, § 9 (Massachusetts Uniform Probate Code) (requiring that petition for formal probate of will be filed requesting order "in relation to a particular instrument" [emphasis added]).

they should do with the February 1 document.  On May 21, 2007, Skiathos filed a "Motion for Instructions" concerning that issue.  In its motion, Skiathos expressed its lack of clarity as follows:

> "It is unclear to the parties whether the Court would like a copy of the February 1, 2000 Will filed with this matter, if the Court would like a petition filed for the February 1, 2000 Will or whether the Court would want a Motion to Allow this Will in the Alternative filed in this matter."

A close reading of this awkwardly phrased sentence reveals that Skiathos was seeking guidance on two distinct issues:  first, whether it should file a formal petition to have the February 1 document presented for probate, and second, whether it could file a copy of that document in lieu of the original because the original could not be located.  A judge different from the trial judge endorsed the motion as "allowed," together with a notation that read, "[A]s no original exists, filing will not be required."  In other words, the judge expressly addressed only the issue regarding the missing original, not what procedure Skiathos should use if it wanted to present the February 1 document for probate.

We acknowledge that the motion judge's response to the motion for instructions may not have alleviated Skiathos's confusion about what procedure it should have followed if it had wanted to present the February 1 document for probate.  However, precisely because of that remaining uncertainty, it was

incumbent on the proponents to seek further clarification from the court.  See Coyne Industrial Laundry of Schenectady, Inc. v. Gould, 359 Mass. 269, 275-276 (1971).  Neither the will proponents nor the executor did so.  In any event, the judge's incomplete response to the awkwardly phrased motion did not relieve the will proponents of their obligation to follow proper procedures.  See Ferriter v. Borthwick, 346 Mass. 391, 393 (1963) ("In situations where there is more than one will it is within the power of the judge to require petitions to be filed to probate each will and to hear them together").  Because the February 1 document was not presented for probate,[12] the trial judge correctly concluded that whether it should have been allowed as Galatis's will was not properly before her.[13]

Judgment affirmed.

---

[12] Our review of the Probate and Family Court docket reveals that on November 15, 2013, after judgment entered disallowing the February 9 will, a petition was filed to probate the February 1 document.  The fate of that petition, which apparently was filed by Damaskos, is not before us.

[13] We deny the contestants' request for double costs, damages, and interest pursuant to Mass.R.A.P. 25, as appearing in 376 Mass. 949 (1979).

BERRY, J. (dissenting).  I dissent because I do not think that the trial evidence was sufficient to prove that Charles P. Galatis lacked the requisite testamentary capacity at the time he executed his will on February 9, 2000.  Contrary to the majority, I look to material evidentiary points at trial, which I think establish testamentary capacity.

The first trial evidentiary point of reference to which I look as proof of testimony capacity:  during the afternoon of February 9, 2000, the day that Galatis signed the will, he manifested measurable periods of stability, lucidity, and awareness reflecting testamentary capacity to execute the will.  Specifically, during the afternoon of February 9, the trial evidence -- including contemporaneous medical records -- demonstrated that Galatis was lucid and aware of his surroundings.  This lucidity is clear evidence (especially when coupled with the testimony of the witnesses to the will, see discussion, _infra_), that Galatis knew what he was doing in bequesting his estate.  He knew the objects of his bounty, primarily a Greek educational charitable trust on the island of Skiathos (which would be the main beneficiary of his real estate in Greece), but also eleven other individual beneficiaries who received monetary bequests.  Specifically, as more fully detailed in part 1, _infra_, according to the medical records, by 1 P.M. and 2 P.M. on February 9, Galatis had recovered from an

adverse reaction to a drug (Ativan) which had been given to him the day before. In his recovery from the adverse drug reaction, by February 9 in the afternoon and into early evening, Galatis was back at "baseline" and had regained lucidity. For example on February 9, at 1:00 P.M., Galatis is described in the medical records as "A+O x 3" -- i.e., oriented to person, place, and time. Similarly, at 2:00 P.M. the medical records describe Galatis as "recovered from last night's events" and "back to baseline." At 7:00 P.M. Galatis is described as "clearly better than yesterday," when the Ativan was administered. These measurable periods of clarity during the afternoon of February 9, when added to the testimony of the witnesses to the will, reflect a sufficient intervening period of testamentary capacity. "Acting during a lucid interval can be a basis for executing a will." Farnum v. Silvano, 27 Mass. App. Ct. 536, 538 (1989). See O'Rourke v. Hunter, 446 Mass. 814, 827 (2006) ("[T]he contestants offer no evidence that she lacked testamentary capacity during the . . . discussions with her attorney or . . . when she executed her will").

The second trial evidentiary point of reference to which I look as proof of testamentary capacity: the testimony of the witnesses to the will, including the attorney who drafted the will and two nurses who served as attesting witnesses, all confirmed that Galatis was alert, responsive, of sound mind, and

knew he was executing a will.  In addition, other friends visiting Galatis on February 9 testified that Galatis was alert and aware when they saw him.

The third trial evidentiary point of reference to which I look as proof of testamentary capacity:  there is an almost complete congruence between the contested February 9 will and a first will signed by Galatis on February 1.  That February 1 will was drafted by a nonlawyer friend at Galatis's request, and it is undisputed that Galatis was of sound mind with testamentary capacity on February 1.  It was Galatis who requested that an attorney draft the February 9 will to replace the nonlawyer's draft.  As noted, the February 9 will is wholly consistent with Galatis's prior February 1 will bequests, including the creation of the Greek educational charitable trust, and is consistent dollar by dollar in the eleven other individual bequests totaling approximately $90,000.

Given the foregoing, I am not persuaded the contestants met the burden of proving that Galatis lacked testimony capacity. To the contrary, I read the trial evidence as supporting, by a preponderance of the evidence, that Galatis had the requisite testamentary capacity to execute his will on February 9.  "It is well established that to determine testamentary capacity, [t]he critical question is whether the testator was of sound mind at the time the will was executed."  Estate of Rosen, 86 Mass. App.

Ct. 793, 798 (2014), quoting from O'Rourke v. Hunter, supra. "At the time of executing a will, the testat[or] must be free from delusion and understand the purpose of the will, the nature of [his] property, and the persons who could claim it." O'Rourke v. Hunter, supra at 826-827. Cf. Daly v. Hussey, 275 Mass. 28, 29 (1931).

There is no dispute that the will was signed during the day on February 9 and, as referenced above, that Galatis was of sound mind, alert, and responsive during a major afternoon segment on that day. Indeed, the majority acknowledges that "[a]ssessing Galatis's mental state when the will was signed on February 9 against the backdrop of the medical records was made particularly challenging by the fact that no testimony or other evidence established at what time that day the signing actually took place." Ante at . But even though the precise time of signature is not provable, to accept the majority's position would be to accept the proposition that Galatis was not of sound mind to execute his will at any time on February 9. That is not so.

I turn to more details concerning the three points of the trial evidence which, I believe, show testamentary capacity.

1. The medical evidence. I begin with the contemporaneous medical records. At approximately 4:30 P.M. on February 8, 2000, the day before the will was signed, Galatis was given the

drug Ativan.  He had adverse reactions including a facial droop, confusion, drowsiness, asterixis, and a temporary diagnosis of encephalopathy.  But quickly after the adverse reaction, Galatis was given flumazenil, an antidote to Ativan.  Dr. Barrette testified that "Mr. Galatis received his first dose of Flumazenil at 6:00 P.M., 90 minutes after the Ativan was given, and a second dose one hour later at 7:00 P.M."  Another physician, Dr. Whaley, confirmed that "because Flumazenil is an antidote . . . it can reverse the effects of Ativan."  A third physician, Dr. Stoeckle, corroborated that flumazenil is an antidote to Ativan.

Medical notes reveal that during the early hours of the next morning on February 9, Galatis was still not at baseline. At approximately 6:00 A.M., a nurse's note states that Galatis was "lethargic most of the night . . . Ativan reaction. Arousable to voice. . . .  [s]till weak but more responsive to pain.  Alert but confused to place."  At 11:00 A.M. Galatis still had lingering effects from the Ativan as "[h]is mental status is not [at] baseline."

According to the medical records, however, as time passed to the afternoon, there was a significant turning point in Galatis's condition as he recovered from the adverse effects of Ativan, the antidote flumazenil took effect, and Galatis returned to "baseline."  This is important, because from all

that appears, including the testimony by the attorney and the nurses who witnessed the will, there was stabilization noted at 1:00 P.M. and continuing throughout the afternoon of February 9, all of which supports testamentary capacity.

The stabilization is noted in a 1:00 P.M., nurse's note stating that "pt stated he 'felt better.'  Pt. A+O x 3 [a term meaning a patient who is oriented to person, place and time], but stated he had 'general confusion.'"  This note is corroborated by Dr. Stoeckle's note of 1:30 P.M. that Galatis was "[a]lert at moment.  To radiation Rx at 2:30.  Again reiterated goals with patient.  Ready for transfer AM."

At about 2:00 P.M. on February 9, the medical records describe further stabilization and recovery:  "pain services helped pt learn to use PCA.  Pt recovered from last night's events . . . . Pt seems back to baseline."  Dr. Stoeckle's notes from the same time period describe Galatis as "quite alert," and "mood up, without complaint of pain!"  Lastly, as night approached, at 7:00 P.M., a nurse's note states that Galatis was "clearly better than yesterday."  He "continues to be sleepy and at times confused and he is aware of confusion."  The note also describes that "[f]amily members going over pt legal paper and will today."[1]

---

[1] Given the totality of the trial evidence that Galatis was lucid and alert at the time of the will signing, including

The majority (as did the trial judge) relies heavily on the expert testimony of Dr. Whaley. However, Dr. Whaley was not a treating physician but rather a psychiatrist who never examined, treated, or even met Galatis. See <u>Union Trust Co. of Springfield</u> v. <u>Kittredge</u>, 298 Mass. 515, 516 (1937) (opinions of psychiatrists that decedent was of unsound mind were insufficient to raise issue of capacity in light of detailed evidence from "physician and nurses who actually treated and cared for the decedent"); <u>Nichols</u> v. <u>Sullivan</u>, 340 Mass. 783, 783-784 (1959) ("The expected testimony of psychiatrists who had not seen the decedent . . . was of substantially less weight than [the proponents' evidence] which would support a finding of testamentary capacity"). The majority also cites to Dr. Stoeckle's trial testimony that Galatis was mentally impaired throughout February 9 and could not understand the nature and significance of executing a will. See <u>ante</u> at  . But Dr. Stoeckle's trial testimony directly conflicts with his contemporaneous 1:30 <u>P</u>.<u>M</u>. medical record entry of Galatis's recovery on February 9 in which Dr. Stoeckle wrote that Galatis

---

especially the medical records, it is inferentially reasonable to conclude that the will was likely signed in the afternoon. This inferential timeline is supported by post 2:00 <u>P</u>.<u>M</u>. medical record entries as well as the nurse's note at 7:00 <u>P</u>.<u>M</u>. about legal papers and a will signing. The proponents of the will also submit there was an afternoon will signing.

was "quite alert," and "mood up, without complaint of pain!"[2] Further, Dr. Stoeckle conceded on cross-examination that he did not know what it meant to have, or not have, testamentary capacity. And, I note there was a hotly contested trial debate whether Dr. Stoeckle's affidavit, which was prepared in connection with the will contest and which includes a negative opinion about testamentary capacity, had been drafted by the trial attorney for the contestants notwithstanding the conflicting entry by Dr. Stoeckle in the contemporaneous February 9 medical records.

2. <u>Witnesses to the will and other witnesses</u>. In addition to the medical records which reflect Galatis's lucidity and ability to execute a will knowing the Greek charity and other beneficiaries, the trial evidence included the eyewitness testimony of three attesting witnesses to Galatis's will signing. The drafting attorney and the two nurses who witnessed the execution of the will on February 9 all testified that Galatis was alert, responsive, and of sound mind. Specifically, Attorney O'Neil testified that in her opinion, Galatis understood the contents of the will at the time it was executed

---

[2] The majority's reliance on the handwriting in Galatis's signature on the February 9 will, as compared to his signature on earlier medical consent forms and the February 1, 2000, will, is tenuous. Our case law makes clear that a testator's signature to a will need not be in any particular form. See <u>Chase</u> v. <u>Kittredge</u>, 11 Allen 49, 53 (1865).

and that Galatis also understood the nature of his bounty, was of sound mind at the time he executed his February 9 will, and had testamentary capacity. Nurse Maryann Benoit observed Galatis to be alert, of sound mind, and seeming to understand the act of making a will. Benoit testified that, based on her observations, Galatis was aware that he was signing a will, that he knew that he was signing a will, that he was aware of who was around him when the will was signed, and that he "was alert and knew what he was doing." Nurse Jennifer Mathisen testified that while she did not have a personal recollection of the will signing ceremony, she would not have attested to the signing of the will if Galatis were not competent to sign. See Farrell v. McDonnell, 81 Mass. App. Ct. 725, 727-731 (2012).

The testimony of the attorney and the witnesses to the will as to Galatis's lucidity was corroborated by the testimony of Galatis's friends, Steven Damaskos and Demetrios Skopas. Damaskos testified that "he found Mr. Galatis to be clear minded and able to communicate during his visits at the hospital," and Skopas testified that he had no difficulty communicating with Galatis until the day of his death and that when Galatis executed the February 9 will "[h]e had a clear mind."

3. The will consistency. I also consider as support for Galatis's testamentary capacity that the will signed February 9, which was prepared by an attorney, was a virtual dispositional

match to the first will signed February 1, which was prepared by a nonattorney and signed by Galatis eight days before, when it is undisputed that Galatis was of sound mind with testimony capacity.

Specifically, the February 9 will is materially consistent with the principal dispositional wishes of the first February 1, 2000, will, including the creation and formation of the Greek educational charitable trust which was Galatis's principal bounty. Both the February 9 will and the February 1 will contain consistent provisions providing for Galatis's current tenants in one of his real estate holdings in Greece to remain there rent free for as long as they lived. Additionally, both the February 9 will and the February 1 will are consistent in appointing Skopas the executor. Finally, both wills name Eugenia Bodenlos, a friend of Galatis's, as the contingent executor. The February 9 will only differs in a minor change in the makeup of the administrative committee which was to oversee the assets of the Greek charitable trust. There were other important points of similarity apart from the educational foundation. For example, the February 9 will and the February 1 will both provide for eleven individual monetary bequests, naming the exact same eleven beneficiaries.

"Testamentary capacity requires ability on the part of the testator to understand and carry in mind, in a general way, the

nature and situation of his property and his relations to those persons who would naturally have some claim to his remembrance." Goddard v. Dupree, 322 Mass. 247, 250 (1948). These beneficiary and dispositional similarities are remarkably consistent and reflect that Galatis was able to fully understand the provisions of a will on February 9.  The will consistencies are further evidence that Galatis had the ability to understand and appreciate the nature of his property and to execute a will knowing the objects of his bounty on February 9.

For all of these reasons I dissent.  The trial record I conclude by a preponderance of the evidence proves that Galatis had testamentary capacity.