KALLIOPE REMPELAKIS vs. McKINNEY RUSSELL
(and a companion case[1]).

No. 04-P-1489.

Middlesex. June 9, 2005. - February 24, 2006.

Present: COWIN, SMITH, & GREEN, JJ.

*Will,* Testamentary capacity, Undue influence.

This court concluded that where a will is challenged on the ground that a
person in a fiduciary relationship to the testatrix exerted undue influence
on the otherwise competent testatrix, the burden of proving the absence of
undue influence shifts to the fiduciary only where he has actually taken
part in a transaction with the testatrix from which the fiduciary benefited;
accordingly, in circumstances where the executor of the decedent's will
and beneficiary of the decedent's revocable trust was present at the time of
execution of the will and trust documents and arranged for the attendance
of witnesses, but did nothing of substance to bring about the bequest to
him and his family, the burden of proof did not shift to him. [563-567]
The evidence in a will contest action was sufficient to support the Probate and
Family Court judge's findings that the decedent was competent to execute
a will and a revocable trust [567-568], and that the executor and trust
beneficiary exercised no undue influence over the decedent [568-570].

PETITION for probate of a will filed in the Middlesex Division
of the Probate and Family Court Department on August 1, 2001.

COMPLAINT filed in the Middlesex Division of the Probate and
Family Court Department on November 1, 2001.

After consolidation, the cases were heard by *Peter C. Di-
Gangi,* J., and a motion for a new trial was also heard by him.

*George P. Jeffreys* for Kalliope Rempelakis.

*Hanson S. Reynolds* for McKinney Russell.

[1]The companion case was brought by Rempelakis against Russell individu-
ally and in his capacity as executor of Fanny Kouvarakis's estate and as
trustee of her revocable trust. Before trial, the two cases were consolidated.
Rempelakis appeals from the judgment in each case.

COWIN, J. Following the death of Fanny Kouvarakis,[2] the proponent, McKinney Russell, filed a petition for probate of her will dated April 24, 2001, together with a request that he be appointed executor of the decedent's estate. Six first cousins of the decedent, including the appellant, Kalliope Rempelakis, filed objections to the will and appointment, alleging lack of testamentary capacity and undue influence.[3] Subsequently, Rempelakis commenced a separate suit in equity against Russell in which she likewise alleged absence of testamentary capacity and use of undue influence in connection with the decedent's execution of a revocable trust on the same date on which she executed the will. Russell's motion to strike the objections was denied by a judge of the Probate and Family Court; the cases were consolidated; and Russell filed a second motion to strike the objections. After trial, the judge determined that the decedent had testamentary capacity at the time of her execution of the will and revocable trust and that the dispositions set forth therein were not the product of undue influence. He allowed Russell's second motion to strike objections; allowed the will; appointed Russell executor; and dismissed the equity complaint. He also denied Rempelakis's motion for a new trial. Rempelakis's timely appeals from the judgments and from the order denying a new trial bring the cases to this court.

While Rempelakis's arguments take various forms, she asserts essentially two propositions: (1) that the judge improperly allocated the burden of proof on the issue of undue influence to the contestant, notwithstanding the fact that a fiduciary relationship between Russell and the decedent existed at the time of the decedent's execution of the challenged documents, see *Cleary* v. *Cleary*, 427 Mass. 286, 295 (1998); and (2) that the judge's findings of fact with respect both to the decedent's testamentary capacity and to alleged undue influence exerted by, or on behalf of, Russell were clearly erroneous. We construe Rempelakis's second proposition as a contention that the findings were unwarranted regardless of placement of the burden of proof. In addi-

---

[2] Also known as Fotini Kouvarakis.

[3] Only Kalliope Rempelakis has appealed.

tion, Rempelakis argues that it was an abuse of discretion to deny her motion for a new trial.[4]

1. *Undisputed facts.* We recite underlying facts found by the trial judge that appear to be undisputed, leaving for later discussion the disputed facts. The decedent, Fotini G. Kouvarakis, also known as Fanny Kouvarakis, was born in Crete in 1913 and emigrated to the United States in 1927. She married in 1937, her husband dying in 1957. No children were born of the marriage.

From early in her stay in the United States until her death, the decedent maintained a friendly relationship with Mary Houseas, another emigré from Crete. The decedent was friendly with Mary's family as well, including Mary's granddaughter, Athena Koutso. In 1974, Mary rented the upstairs apartment in a house owned by the decedent in Watertown, remaining there until the decedent's death. In 1981, Athena married McKinney Russell, the proponent in the present case. He, Athena, and eventually their children continued a warm relationship with the decedent.

The decedent's heirs at law consisted of six first cousins. In 1988, she executed a will that bequeathed her estate in equal shares to her cousin Kalliope Rempelakis, the present contestant; her godson, Michael Rempelakis; the Greek Orthodox Church in Watertown; and the Hellenic Nursing Home in Canton.

On January 1, 2000, the decedent was admitted to Mt. Auburn Hospital for a heart-related illness. She remained in the hospital for one week. During her hospital stay, she was visited both by Russell and Athena and by Rempelakis. While there, she executed a health-care proxy naming Russell as proxy with Rempelakis as successor proxy. On one occasion, during a visit with Athena, she requested that Athena change the decedent's 1988 will by "whiting out" the name of Michael Rempelakis as a beneficiary, but Athena declined, stating that the decedent should consult an attorney if she wished to alter her will. On

---

[4]Rempelakis makes a passing attack on the judge's allowance of Russell's second motion to strike objections, claiming that the action was procedurally improper. She acknowledges, however, that a subsequent final judgment entered after trial effectively cured any problem that might have arisen with respect to that prior order.

January 8, 2000, the decedent was transferred to the Hellenic Nursing Home, where she was also visited by Russell, Athena, and Rempelakis. During this period, Rempelakis attended to various needs of the decedent, including paying her bills by signing her name to checks.

The decedent was discharged from the nursing home in March, 2000. Shortly thereafter she had a disagreement of some kind with Rempelakis, and the two women did not see each other again for more than one year. On April 2, 2001, the decedent was admitted to St. Elizabeth's Hospital with acute diverticulitis and a possible small abscess. While in the hospital, the decedent requested of Russell that he locate an attorney to assist her in placing her financial affairs in order. At this time, she also mentioned the possibility that she would appoint Russell her attorney-in-fact. Pursuant to that request, Russell contacted an attorney who was unable to accept the work at that time, and then turned to Matthew Erskine, a social and business acquaintance who had previously done both personal and corporate legal work for Russell, but who was not then representing him in any matter.

On April 10, 2001, as the result of a diagnosis of acute arterial ischemia, the decedent underwent an embolectomy. Although she was in stable physical condition thereafter, on April 15, 2001, she was diagnosed as having mixed aphasia (both expressive and receptive), Wernickes aphasia, and disorientation resulting from a stroke. A CT scan proved negative, but hospital records of April 17 and 18, 2001, state that the decedent continued to do poorly after "likely stroke." On April 18, 2001, Russell and Grace Fanelli, a friend of the decedent, visited the decedent in her hospital room and had her execute a power of attorney in favor of Russell so that he could pay the decedent's bills. Fanelli assisted the decedent in executing the document.[5] Later that day, however, Fanelli stated to Russell that she was concerned that she might have committed an il-

---

[5]Rempelakis characterizes the event somewhat differently, asserting that Fanelli actually executed the power of attorney for the decedent. We view the distinction as insignificant. The question is whether the decedent was competent and actually intended to give Russell the power, not how that intention was effectuated.

legality by assisting the decedent in executing the power, and as a result, Russell returned the power without making use of it.

On April 19, 2001, Erskine met with the decedent alone in her hospital room to discuss her estate. Based on testimony of Dr. Paul Fergus, the decedent's treating physician, the decedent was alert and able to communicate that morning. The decedent expressed to Erskine her desire that her estate be left to Russell and then to his children. Erskine recommended that Russell's wife, Athena, be named as alternate beneficiary, followed by the children, and the decedent agreed. She insisted that a will be drafted immediately, and Erskine prepared a simple handwritten will for execution at that time (subject to the subsequent preparation of a more formal estate plan). Within about thirty minutes, Russell and Jackie Ellis, a licensed social worker who had worked with the decedent since the previous summer, arrived separately at the hospital room. Erskine read the handwritten will to the decedent in the presence of both Russell and Ellis. The decedent agreed that it reflected her wishes and executed it before Erskine and Ellis as witnesses. At the same meeting, Erskine produced a durable power of attorney designating Russell as attorney-in-fact, and explained to the decedent the document's significance. The decedent executed the power before Erskine and Ellis as witnesses, with Erskine providing the notarization.

Thereafter, Erskine prepared a formal will and revocable trust.[6] A meeting was scheduled at the decedent's hospital room on the morning of April 24, 2001, at which time Russell, at Erskine's request, arranged for Ellis and Vadim Droznin, Russell's business partner, to be present to serve as witnesses. Russell was also present at the meeting. On the basis of the testimony of the participants, as well as that of Dr. Fergus, the judge found that the decedent was competent to understand and execute a will on that occasion and that her competence to do so was not diminished by medication. Erskine read the will to

---

[6]The revocable trust instrument provided essentially that the decedent would receive income and principal as necessary for her reasonable support during her lifetime, the remainder to be distributed to Russell; to Athena if she were predeceased by Russell; or to their issue if predeceased by both.

the decedent who indicated that she understood and agreed, and then executed the will before Ellis and Droznin as witnesses. Erskine then summarized the provisions of the revocable trust which, given its length, he did not read in its entirety. The decedent again indicated her understanding and agreement, and executed the trust instrument, giving an acknowledgment to Erskine as notary. Russell also signed the trust instrument to acknowledge his acceptance of his appointment as trustee. That afternoon, Rempelakis, accompanied by Attorney George Jeffreys[7] and Jeffreys's wife, whose mother was friendly with the decedent, visited the decedent for the first time in more than one year.

On Erskine's advice,[8] Russell, in his capacities as trustee and attorney-in-fact, located the decedent's significant financial documents and forwarded them to Erskine. In searching for the documents, Russell discovered the decedent's now superseded 1988 will, the contents of which had previously been unknown to him. He also uncovered approximately $475,000 in certificates of deposit of which he and Athena had also previously been unaware (the couple believing that the decedent's estate consisted of her Watertown house, an automobile, and a savings and checking account). Again acting on Erskine's advice, Russell, pursuant to his authority under the durable power of attorney, liquidated the certificates of deposit and transferred the proceeds to the revocable trust[9] and, on May 16, 2001, also transferred to the trust the decedent's Watertown real estate. In addition, Russell had his name added as a signatory to the decedent's savings and checking accounts and, on the advice of the bank manager, combined the accounts into a single account that he used to pay the decedent's bills. He made no use of the account for his personal benefit during the decedent's lifetime.

In May, 2001, Rempelakis reported to West Suburban Elder Services that Russell had engaged in financial abuse of the decedent. Diane Johnson investigated on behalf of that agency,

[7]Jeffreys subsequently represented Rempelakis in the proceedings in the Probate and Family Court, and continues to do so in this appeal.

[8]The judge found that Erskine continued to act as the decedent's attorney and that he was ultimately compensated for his services by her estate.

[9]In doing so, the trust incurred penalties of approximately $8,791.

and concluded that there was no evidence of improprieties on Russell's part. The decedent died on June 24, 2001.

2. *Burden of proof.* There is no dispute with respect to the proposition that the proponent of a will, in this case Russell, has the burden of proving that the decedent had testamentary capacity at the time of her execution of the instrument. See *Duchesneau* v. *Jaskoviak,* 360 Mass. 730, 732 (1972); *Palmer* v. *Palmer,* 23 Mass. App. Ct. 245, 250 (1986). If there is a challenge to the will on the ground of undue influence exerted on an otherwise competent testatrix, the burden of proving that undue influence occurred is ordinarily allocated to the contestant. See *Tarricone* v. *Cummings,* 340 Mass. 758, 762 (1960). The rule is, however, otherwise in certain circumstances where a person in a fiduciary relationship with a principal benefits by means of a transaction with that principal. See *Cleary* v. *Cleary,* 427 Mass. at 295. A decision in the present case requires a determination regarding the scope of application of the *Cleary* burden-shifting rule: specifically, whether the rule applies in *any* instance in which a fiduciary benefits from action by his principal, or applies only where the fiduciary actually participates in a transaction with his principal from which the fiduciary benefits. While there are arguments both ways, we conclude that the burden of proving the absence of undue influence shifts to the fiduciary only where he has actually taken part in the questioned transaction.

Here, the judge found that Russell took no meaningful part in the decedent's decision to supersede her 1988 will in favor of a new disposition that benefited Russell and his family. The first indication that the decedent wished to alter the 1988 will came in January, 2000, when the decedent asked Athena to "white out" the name of Michael Rempelakis, a change that would not have benefited Russell or his family, and a request that was in any event rejected by Athena. Russell was unaware of the extent of the decedent's assets, believing that they were limited to the Watertown house, an automobile, and a savings and checking account. The subject of the decedent's financial affairs was first introduced to Russell by the decedent herself when she requested

that Russell locate an attorney and said that she might appoint Russell her attorney-in-fact.[10]

In response to the decedent's request, Russell arranged for Attorney Erskine to provide counsel to the decedent. The judge found that Erskine at all relevant times provided independent legal counsel to the decedent for her sole benefit. On April 18, 2001, Russell obtained a power of attorney from the decedent so that he could pay her bills,[11] but returned it when Fanelli questioned the propriety of assisting the decedent with respect to its execution. Russell entered into a fiduciary relationship with the decedent for the first time when she executed a power of attorney in his favor on April 19, 2001. See *Gagnon* v. *Coombs*, 39 Mass. App. Ct. 144, 154 (1995) (power of attorney creates fiduciary relationship with respect to all matters embraced by the power). Thereafter, although Russell was present when the decedent executed the formal will and revocable trust on April 24, 2001, and while he arranged for the presence of Ellis and Droznin to act as witnesses, the judge found that he did nothing to influence the decedent's decision or to prepare the implementing documents.

The question, then, is whether, in these circumstances, Russell had the burden of proving that the decedent's disposition of her estate in April, 2001, was not the product of his improper influence. In *Cleary* v. *Cleary*, "the defendant, [his aunt's] insurance agent and attorney-in-fact, assisted her in designating himself the beneficiary of two annuity policies worth approximately $446,000." 427 Mass. at 286. Specifically, the case focused on certain annuity polices[12] owned by the aunt that had designated her estate as the beneficiary. *Id.* at 287. The plaintiff and defendant benefited equally under her will. *Ibid.* The defendant, claiming that his aunt requested that he obtain forms by which she could designate him the sole beneficiary of the

---

[10]During the decedent's earlier stay at the Hellenic Nursing Home between January and March, 2000, her daily needs were managed by Rempelakis, who also paid her bills by signing her name to checks without a written power of attorney.

[11]By this time, Rempelakis had not seen the decedent for more than one year.

[12]While there were four annuity policies in all, only two were at issue in the case.

annuity policies, *ibid.*, some five months later, and approximately one and one-half months prior to his aunt's death, brought a form to her at the nursing home where she was then a resident, and explained to her that the form would extend the maturity date on the two policies while also naming him sole beneficiary. *Id.* at 288. His aunt signed the form, and the defendant filed it with the insurer. *Ibid.* A subsequent law suit by the plaintiff provoked consideration of the issue as to which party bore the burden of proof on the question of undue influence.

In concluding that the defendant had the burden of establishing that he had not exerted undue influence on his aunt in connection with the change of beneficiary, the court in several places in its opinion refers expressly or impliedly to a transaction between the fiduciary and the principal. Thus, the court initially formulates its conclusion by stating that "the defendant bore the burden of proving that *in rendering assistance* he did not breach his fiduciary duty to [his aunt]" (emphasis supplied). *Cleary* v. *Cleary, supra* at 286. Elsewhere, the court notes that "[t]he burden shifts . . . when a fiduciary benefits *from a transaction* with his principal" (emphasis supplied). *Id.* at 290. This observation is followed immediately by an analogy to the fiduciary relationship between attorney and client with a reference to the attorney "who bargains with his client in a matter of advantage to himself." *Id.* at 290-291, quoting from *Webster* v. *Kelly*, 274 Mass. 564, 571 (1931). The court refers as well, *Cleary, supra* at 294, to other attorney-client cases, in each of which there was an actual transaction between the fiduciary and his principal. The court then concludes its discussion of the allocation of burden of proof by stating, "[W]e now hold that the fiduciary who benefits *in a transaction* with the person for whom he is a fiduciary bears the burden of establishing that the transaction did not violate his obligations" (emphasis supplied). *Id.* at 295.

We are not prepared to assume that the Supreme Judicial Court casually included multiple references to "transactions" between fiduciary and principal, the rendering of assistance by the fiduciary in connection with the event from which he benefits, or the "bargaining" between fiduciary and principal in

a matter of advantage to the fiduciary, without intending that the references have some meaning. We grant that the *Cleary* case involved a transaction between fiduciary and principal. But the ease with which the court could, if it wished, have stated a general principle that *any* fiduciary who benefits from *any* act of his principal in *any* circumstances has the burden of justifying the action suggests that its failure to do so was purposeful, and that it intended to limit the occasions on which a shift in the normal burden of the contestant to prove undue influence takes place.[13]

In other contexts, we have limited the shifting of the burden to situations in which the fiduciary actually transacted with the principal within the scope of the fiduciary relationship. In *Adelson* v. *Adelson*, 60 Mass. App. Ct. 753 (2004), we determined that the defendant owed the plaintiff a fiduciary duty in respect to the operation of a close corporation of which they were both shareholders. *Id.* at 767. We went on to say, however, that the fiduciary relationship did not extend to a personal transaction, not involved with corporate governance, whereby the defendant acquired the plaintiff's stock and that the burden of justifying that transaction did not shift to the defendant. *Id.* at 768. Thus, the fact that the defendant was a fiduciary with respect to a given subject (corporate governance) did not impose on him a burden to justify other transactions with his principal, even though he benefited from them. See *Geller* v. *Allied-Lyons PLC*, 42 Mass. App. Ct. 120, 125 n.8 (1997) ("when a self-interested contract is challenged, the burden is on the fiduciary to prove its fairness"). That case involved an express agreement between a corporate fiduciary and the corporation. Cases cited in the pertinent footnote each dealt with a transaction in which the fiduciary actually participated.

Our reading of *Cleary* is influenced not only by the language of that opinion, but by considerations of policy as well. Fiduciaries are often relatives or friends of the principal, and

---

[13]We note that there are also circumstances in which "a beneficiary occupies a confidential but not fiduciary relationship with the deceased." *Cleary*, 427 Mass. at 290 n.2. Here, a fiduciary relationship plainly existed by virtue of the power of attorney executed on April 19, 2001, and we do not consider what the outcome might be in a confidential, but not fiduciary, relationship.

thus frequently are natural objects of the principal's bounty. Indeed, it is the principal's feelings for the fiduciary that many times result in both the choice of that individual to perform fiduciary functions and the desire to reward the fiduciary in some manner. We think it a peculiar proposition that this natural state of affairs should be presumed in all instances to be the product of sinister behavior on the part of the fiduciary unless he proves otherwise. It is one thing to require such proof where the fiduciary himself brings about the benefit, even where the fiduciary is a relative or close friend of the principal. See *Cleary*, 427 Mass. at 292-293. It is something else entirely to require it (and accordingly to require the fiduciary to prove a negative) where the fiduciary benefits from the principal's generosity without any role in the decision. We suspect that such a rule would result in the invalidation, or at least the complication, of legitimate conveyances far more often than it results in identifying conveyances that ought to be set aside. We believe *Cleary* does not go this far, and that such cases should be left to normal assumptions regarding the regularity of duly executed documents and placement of the burden of proof on the party who wishes to invalidate the conveyances that such documents contemplate. In the present case, Russell did nothing of substance to bring about the bequest to him and his family. His presence at the time of execution of the documents and his arrangement for the attendance of witnesses did not constitute the kind of participation in the transaction to which *Cleary* is addressed, and we rule that the burden did not shift to him in these circumstances.

3. *Sufficiency of the evidence.* Having concluded that the judge properly allocated the burdens of proof to Russell on the issue of testamentary capacity and to Rempelakis on the issue of undue influence, we determine further that the judge's findings on both questions were warranted. Rempelakis's arguments in this regard are devoted largely to identification of evidence that supports her position. However, the judge was not obligated to believe that evidence, or to assign it any particular weight, and his findings shall not be set aside unless they are clearly erroneous. See *Diranian* v. *Diranian*, 55 Mass. App. Ct. 605, 608 (2002). While the judge's findings on this record were by no means compelled, they were certainly permissible.

With respect to the decedent's testamentary capacity, there was evidence that the judge credited that on the morning of April 19, 2001, the day on which the decedent executed the handwritten will and the power of attorney, she was alert, responsive, and able to communicate in complete sentences. She was also fully able to understand the nature of her assets, the advice given her by Erskine and the purpose of a power of attorney, and to communicate to Erskine how she wished to allocate her estate. Likewise, there was evidence, also credited by the judge, that on April 24, 2001, the date of her execution of the formal will and the revocable trust, she was alert, coherent, communicative, and understanding of the events and her decisions. With respect to the effects of her previous possible stroke, it was for the judge to decide whether to be guided by Dr. Fergus's opinion that she continued to make a solid recovery; that she was competent to understand and execute a will; and that she was not affected by medication.

Rempelakis counters by emphasizing the evidence that the decedent underwent an embolectomy on April 10, 2001; was diagnosed on April 15, 2001, as having mixed aphasia and having had a stroke; was observed then to be confused and disoriented; and continued to do poorly on April 17 and 18, 2001. She argues also that there was evidence that, on April 24, 2001, the decedent communicated assent to the will and revocable trust only by nodding agreement. She relies in addition on the opinion of Dr. Martin Albert that, given the decedent's neurological problems, she was incapable of understanding the contents and significance of the various documents she executed. However, these arguments reveal only that there were conflicts in the evidence on the subject of the decedent's testamentary capacity at the critical time. It was for the judge to decide whom to believe and what weight to assign to evidence. With evidence in the record sufficient to support his finding that the decedent was competent to execute the will and revocable trust, the existence of contrary evidence did not render his finding unwarranted.

The same analysis applies to the issue of undue influence. Undue influence with respect to a testamentary gift may be found where there is an unnatural disposition; the testatrix is

susceptible to undue influence to the advantage of an individual; that individual has an opportunity to exercise undue influence; and he in fact does so in order improperly to procure the unnatural disposition. See *Heinrich* v. *Silvernail*, 23 Mass. App. Ct. 218, 223 (1986). The judge applied the appropriate criteria and found, on adequate evidence, that no undue influence had been exercised by Russell or on his behalf.

Beside finding that the decedent was competent to execute a will, the judge determined that neither Russell nor Athena took any action to isolate the decedent from relatives or other friends, and did nothing to bring about replacement of the 1988 will with a will favorable to themselves. Indeed, there is no evidence that Russell ever communicated with the decedent in any way on the subject, and any inference that his status under the power of attorney meant that he influenced the outcome would be wholly unwarranted. The judge also permissibly found that Erskine provided independent counsel to the decedent unaffected by any social or business relationship he may have had with Russell. That finding by itself may be sufficient to end the case regardless of the allocation of the burden of proof. See *Cleary*, 427 Mass. at 291 (the burden to prove the transaction was fair "is generally met if the fiduciary shows that the principal made the request with full knowledge and intent . . . or with the advice of independent legal counsel") (citation omitted). Finally, there was evidence to support the judge's finding that the decedent's relationship with Russell, Athena, and their children was such that the testamentary disposition was a natural one, particularly given the decedent's recent estrangement from Rempelakis.[14]

Rempelakis again challenges the findings on the ground that there was evidence to the contrary. She points to evidence that

[14]We observe that the will of April 24, 2001, disinherited not only Rempelakis and Michael Rempelakis, but the two charities as well. While the evidence provides a logical explanation for the change as to Rempelakis (the estrangement) and Michael Rempelakis (the decedent had earlier requested of Athena that his name be removed from the 1988 will), it supports no finding regarding any motivation the decedent may have had with respect to the charities. However, once the judge permissibly found testamentary capacity and the absence of undue influence, he was not required to resolve any other imponderables. Rempelakis's suggestion of bias or predisposition on the part of the judge because of a colloquy with reference to the charities is baseless.

Erskine and Russell had a relationship that, she speculates, could have interfered with Erskine's independent legal advice to the decedent. She relies on her own testimony and that of another witness, Diane Johnson, that the decedent stated that she did not wish to leave her property to the Russells. In addition, she places great weight on actions taken by Russell pursuant to the power of attorney after April 24, 2001, transferring certain of the decedent's property. As in the case of testamentary capacity, these arguments establish only that the evidence was in conflict, not that the findings were unwarranted. Russell's post-April 24, 2001, transfers were on advice of the decedent's counsel, were not for his benefit, and were, in any event, of dubious relevance given that the decedent had already executed the will and revocable trust. We have no difficulty in concluding that the judge's findings were not clearly erroneous.[15]

4. *Other issues.* The judge did not abuse his discretion in denying Rempelakis's motion for a new trial. The motion essentially demanded a revisiting of factual and legal issues that the judge had already decided, in our view, correctly. We deny Russell's request for appellate attorney's fees on the asserted ground that Rempelakis's appeal is frivolous. Rempelakis has not prevailed, but her appeal is not frivolous. We agree, however, that Rempelakis, in an appeal based largely on disputes regarding evidentiary support of findings, should not have thrust on Russell the burden of assembling a supplemental appendix containing a trial transcript. Russell may file a motion in the Probate and Family Court for award of reasonable costs in this regard. See Mass.R.A.P. 18(b), as amended, 425 Mass. 1602 (1997).

> *Judgments affirmed.*
>
> *Order denying motion for new trial affirmed.*

---

[15]We acknowledge and agree with Russell's argument that the findings are warranted irrespective of the allocation of the burden of proof. However, that the evidence is sufficient to permit findings does not mean that the judge would necessarily have made such findings if he had allocated the burden differently, see *Cleary, supra* at 295 n.5, and we do not decide the case on this ground.