NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-765

IN THE MATTER OF THE ESTATE OF EDWARD A. MORGAN, SR.


MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After Edward A. Morgan, Sr. (decedent), passed away in 2023, his sister (petitioner) filed a petition to probate his will.  The decedent's daughter and son, Renee J. Whitehead and Edward A. Morgan, Jr., filed objections with supporting affidavits,[1] which the petitioner moved to strike.  A Probate and Family Court judge allowed the petitioner's motion, finding that the affidavits contained insufficient allegations to establish undue influence, fraud, or lack of testamentary capacity.  A decree admitting the will to formal probate entered, and the objectors appeal.  We affirm.

---

[1] We will refer to the daughter and son together as "objectors."  We will refer to them individually as "Renee" and "Edward Jr.," as the parties do in their briefs.

Background.  We summarize the factual allegations in the affidavits, which we take as true for purposes of this appeal. See O'Rourke v. Hunter, 446 Mass. 814, 818 (2006).

The objectors are the decedent's only children.  Their mother, the decedent's ex-wife, died in 2019.  The decedent's relationship with Edward Jr., "while at times strained, was along the lines of a typical father and son relationship over many, many years."  "Earlier in the 2000s," they lived in the same apartment and then in the same building, and "[i]n earlier years" they would fish, go to church, attend cookouts, wash the cars, and cut hedges together.  As for the decedent's relationship with Renee, he "often told [her] that he loved [her], and he was always trying to improve [their] father-daughter relationship."  For example, he wrote posts on Facebook in March and August 2022 expressing his love for her.

In or around the spring of 2022, the petitioner "reappeared" in the decedent's life.  This occurred "just when" the decedent had separated from his "companion and 'caretaker'" after the decedent accused her of stealing and taking advantage of him.  The decedent then "allowed [the petitioner] to start to handle his affairs and care."

In approximately June 2022, the petitioner "arranged for the retention of" an attorney (estate attorney) to prepare

2

estate planning documents for the decedent.  At the petitioner's request, the estate attorney drafted a will, among other documents, which granted all of the decedent's real and personal property to the petitioner.  On June 10, 2022, the decedent signed the will in the presence of the estate attorney and other witnesses from his law office.  The petitioner "appear[ed] to have also had [the estate attorney] draft a Power of Attorney," which gave the petitioner "the authority to manage [the decedent's] personal and business affairs while he was still living."

For several years prior to June 10, 2022, the decedent "was suffering from a degenerative cognitive condition which resulted in memory loss, irrational, erratic, and 'crazy' behavior, and other cognitive impairment."  This caused the decedent "to be unable to control his irrational and angry impulses," as evidenced by posts he made to his Facebook account in 2019 and spring of 2022 expressing anger at his deceased ex-wife.  The decedent had also "apparently been diagnosed with cancer" at some point.

The petitioner did not keep the objectors informed about the decedent's health or affairs and "did not originally tell [Renee] that, in addition to [the decedent's] dementia, [he] had been diagnosed with cancer."  In August 2023, when the decedent

3

asked to see Renee, the petitioner arranged for her and her husband to visit the decedent in the hospital.  The decedent was happy to see Renee but did not recognize her husband.  After the visit the petitioner asked Renee if she and the decedent had discussed "the house."  Renee found the question "strange" and replied that "[they] had not and instead had focused on [their] love and father daughter relationship."  Afterward, the petitioner sent Renee a text stating, "Renee what I told u about your dad's house, please don't tell him I said this or anyone ok?"

In September 2023 Renee learned that the decedent was back in the hospital and expressed frustration to the petitioner that she continued to hide information about him.  Later that month or in early October 2023, the petitioner told Renee that the decedent wanted the petitioner "to have the house."  When Renee asked what she meant, the petitioner replied that Renee "should talk to the estate lawyer."

The decedent died on October 8, 2023.  The objectors then learned from the estate attorney that the decedent had excluded them from his will.  After the objectors retained their own attorney, the estate attorney explained to their attorney that the decedent had excluded them because they "had not had any relationship with [their] father."

4

Discussion.  In a proceeding to probate a will, a party who contests the will "shall file a written affidavit of objections to the proceeding, stating the specific facts and grounds upon which the objection is based."  G. L. c. 190B, § 1-401 (e).  If the affidavit of objections fails to state "specific facts and grounds" to contest the will, id., "such affidavit of objections and the appearance of the party filing such affidavit of objections may be struck on motion after notice at any time after filing of such affidavit of objections."  G. L. c. 190B, § 1-401 (f).  The purpose of these statutory provisions is "to help screen out frivolous attacks on wills."  Matter of the Estate of Nevers, 100 Mass. App. Ct. 861, 867 (2022), quoting O'Rourke, 446 Mass. at 817.

The burden on an objecting party is "somewhat higher than that required of a litigant filing a complaint."  Matter of the Estate of Nevers, 100 Mass. App. Ct. at 868.  Specifically, the burden is similar to that applicable "in other areas of the law requiring . . . plaintiff[s] to assert with specificity in their complaint (or other pleading) allegations which, if proved, would entitle [them] to prevail" (quotation and citation omitted).  O'Rourke, 446 Mass. at 818.  One example is Mass. R. Civ. P. 9 (b), 365 Mass. 751 (1974), which provides that "[i]n all averments of fraud, mistake, duress or undue influence, the

5

circumstances constituting fraud, mistake, duress or undue influence shall be stated with particularity." See O'Rourke, supra at 818 n.5.

Here, the judge concluded that the objectors' affidavits failed to allege specific facts supporting their claims of undue influence, fraud, and lack of testamentary capacity. We address these claims in turn, reviewing the judge's decision de novo. See Cusack v. Clasby, 94 Mass. App. Ct. 756, 758 (2019). We consider only the objectors' affidavits in our review. See Brogan v. Brogan, 59 Mass. App. Ct. 398, 400-401 (2003), abrogated on other grounds by O'Rourke, 446 Mass. at 820.[2]

1. Undue influence. "Four considerations are usually present in a case of undue influence: that an (1) unnatural disposition has been made (2) by a person susceptible to undue influence to the advantage of someone (3) with an opportunity to exercise undue influence and (4) who in fact has used that opportunity to procure the contested disposition through improper means" (quotation and citation omitted). O'Rourke, 446 Mass. at 828. Ordinarily, the burden is on the party contesting

---

[2] Because counter affidavits may not be submitted in support of a motion to strike, see Brogan, 59 Mass. App. Ct. at 400-401, we have not considered the materials submitted by the petitioner in her supplemental record appendix. Thus, no action is required on the objectors' motion to strike the supplemental appendix.

the will to prove undue influence, but the burden shifts to the will's proponent to disprove undue influence if the proponent was "in a fiduciary relationship with" the decedent, "benefit[ed] by means of a transaction with" the decedent, and "actually [took] part in the questioned transaction." Rempelakis v. Russell, 65 Mass. App. Ct. 557, 563 (2006). See Matter of the Estate of Urban, 102 Mass. App. Ct. 284, 290 (2023).

The objectors contend that the judge erred here by not shifting the burden to the petitioner to prove lack of undue influence. We disagree because the objectors' affidavits contain insufficient facts to establish that the petitioner was in a fiduciary relationship with the decedent at the time of the will's execution. The general allegation that the decedent "allowed [the petitioner] to start to handle his affairs and care" does not establish a fiduciary relationship. See Cleary v. Cleary, 427 Mass. 286, 292-293 (1998) ("family relations do not suffice to create a fiduciary relationship," and "[s]imilarly, a nurse, housekeeper, or friend is not usually a fiduciary"). Unlike in Cleary, id. at 293, on which the objectors rely, their affidavits do not allege specific facts showing that the decedent was "dependent on the beneficiary in financial affairs." And although a power of attorney creates a

7

fiduciary relationship, see Rempelakis, 65 Mass. App. Ct. at 564, the affidavits do not allege that the petitioner received a power of attorney from the decedent before he executed the will.

Furthermore, the affidavits do not contain adequate allegations to establish that the petitioner actually took part in the creation of the will. Although the affidavits allege that the petitioner "arranged for the retention of [a] law firm" and "asked" the estate attorney to prepare the will, they contain no allegations that the petitioner participated in the drafting process or intruded into the attorney-client relationship between the estate attorney and the decedent. That the petitioner allegedly "arranged" for the execution of the will and the attendance of witnesses is insufficient to shift the burden to her to prove the absence of undue influence. See Matter of the Estate of Urban, 102 Mass. App. Ct. at 291-292 (burden did not shift to fiduciary where he did not participate in drafting of will and did not intrude on attorney-client relationship); Rempelakis, 65 Mass. App. Ct. at 567 (fiduciary's "presence at the time of execution of the documents and his arrangement for the attendance of witnesses did not constitute the kind of participation in the transaction" that would shift burden to him). Cf. Matter of the Estate of Moretti, 69 Mass.

8

App. Ct. 642, 654 (2007) (burden shifted where fiduciary "played a substantial role in the drafting process").

Because the burden of proof thus remained with the objectors, they had to allege specific facts in their affidavits to support their claim of undue influence.  They failed to do so for at least two reasons.  First, the affidavits do not contain allegations sufficient to show an unnatural disposition.  "A testamentary disposition is not 'unnatural' simply because it favors certain members of the testator's immediate family over others."  Rostanzo v. Rostanzo, 73 Mass. App. Ct. 588, 605 (2009).  Indeed, a decedent can "leave his property to a close friend rather than to a relative" without making an unnatural disposition.  Heinrich v. Silvernail, 23 Mass. App. Ct. 218, 224 (1986).  Here, the affidavits are conspicuously void of any allegation that either of the objectors had a close relationship with the decedent, or had even seen or spoken to him, in the time leading up to his execution of the will.  That the decedent left his estate to his sister, who was caring for him, was therefore not unnatural.  See Rempelakis, 65 Mass. App. Ct. at 569; Heinrich, supra.

Second, the affidavits do not identify any particular conduct of the petitioner that establishes that she "procure[d] the contested disposition through improper means" (quotation and

9

citation omitted).  O'Rourke, 446 Mass. at 828.  The objectors'
brief on appeal does not specifically address this element of
their claim.  To the extent the objectors rely on their
allegations regarding the petitioner's retention of the estate
attorney to prepare the will, they do not explain why that was
improper where their affidavits contain no allegations that the
petitioner pressured the decedent to execute the will.  And to
the extent the objectors argue that the petitioner acted
improperly by excluding them from the decedent's life, their
affidavits fail to allege any specific, wrongful conduct in that
regard.  Contrary to the objectors' characterization, their
affidavits do not establish that the petitioner acted as the
decedent's "gatekeeper" by "deciding who had access to see him"
and "when those visits were allowed."  The affidavits allege
only that the petitioner did not keep the objectors informed
about the decedent's health and affairs.  There are no
allegations that the petitioner isolated the decedent, prevented
him from contacting the objectors, or prevented them from
contacting him.  Cf. Matter of the Estate of Moretti, 69 Mass.
App. Ct. at 655-656 (proponent of will used improper means to
procure disposition by isolating decedent from friends and
advisers and injecting himself into decedent's communications
with attorneys).  Absent these types of allegations, the

10

affidavits do not support the objectors' claims that the petitioner engaged in improper means by acting as a "gatekeeper" of the decedent's affairs. See Rempelakis, 65 Mass. App. Ct. at 569.

2. Fraud. For the same reasons, the objectors have failed to allege sufficient facts to support their claim of fraud. Although "[f]raud, in the sense of deceit, . . . is a separate cause of action" from undue influence, where the claim is "that an individual's free agency has been destroyed, the issue can be expressed in terms of fraud or undue influence." Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456, 463 n.7 (1997). In their brief the objectors characterize their claim as fraud based on undue influence. Thus, because the objectors failed to adequately allege undue influence, their claim of fraud likewise fails. See id. at 464. And to the extent the objectors are claiming deceit, they fare no better because their affidavits are void of allegations that the decedent signed the will because he was "affected by a false representation of fact." Id. at 463 n.7, quoting Wellman v. Carter, 286 Mass. 237, 253 (1934).

3. Lack of testamentary capacity. "At the time of executing a will, the [testator] must be free from delusion and understand the purpose of the will, the nature of [his]

11

property, and the persons who could claim it." O'Rourke, 446 Mass. at 826-827. "The critical question is whether the testator was of sound mind at the time the will was executed"; a person "may possess testamentary capacity at any given time and lack it at all other times" (quotation and citations omitted). Id. at 827.

Here, the affidavits do not adequately allege that the decedent lacked testamentary capacity at the time of the will's execution in June 2022. Although the objectors claim that the decedent was suffering from "a degenerative cognitive condition," their affidavits do not allege with particularity that this condition rendered the decedent not of sound mind when he executed the will. See Wimberly v. Jones, 26 Mass. App. Ct. 944, 946 (1988) (objector's affidavit failed to establish lack of testamentary capacity where "no specific fact mentioned in [her] affidavit show[ed] any lack of such capacity"). Again, the objectors do not allege that they ever saw or spoke to the decedent in the relevant time period. That the decedent wrote Facebook posts in 1999 and earlier in 2022 expressing anger at his ex-wife does not show that he "was delusional, incompetent, or confused in the days leading up to the making of [the] will." Haddad v. Haddad, 99 Mass. App. Ct. 59, 70 (2021). Nor does the decedent's cancer diagnosis establish lack of testamentary

12

capacity.  See <u>Wimberly</u>, <u>supra</u> ("We have been referred to no case which holds that the circumstance that a decedent was 'to undergo a life-endangering operation the next day,' by itself, constitutes an indication that the decedent thereby was deprived of soundness of mind").  Finally, the objectors misplace reliance on the allegations in Renee's affidavit regarding the decedent's inability to recognize her husband when they visited the decedent in the hospital.  According to the affidavit, this visit occurred in August 2023, more than one year after the decedent signed the will, and so does not bear on whether the decedent had testamentary capacity to make the will.

<u>Decree affirmed</u>.

By the Court (Blake, C.J., Shin & Wood, JJ.[3]),

Clerk

Entered:  June 25, 2026.

---

[3] The panelists are listed in order of seniority.

13