SUSAN W. PAINE vs. VALERIE E. SULLIVAN.

No. 10-P-289.

Norfolk. December 6, 2010. - July 22, 2011.

Present: KAFKER, SMITH, & HANLON, JJ.

*Undue Influence. Will,* Undue influence, Testamentary capacity.

The evidence in a will contest brought in Probate and Family Court supported the judge's conclusion that the will in question was not the product of undue influence. [816-817]

In proceedings contesting a will executed by a decedent who had exhibited symptoms consistent with a diagnosis of Alzheimer's disease, evidence presented by the decedent's daughter, which demonstrated that the cognitive deficits associated with that disease had manifested themselves in the loss of abilities that bore on the decedent's testamentary capacity, adequately rebutted the presumption of capacity; thus, where the proponent of the will failed to meet her burden of proving that the decedent possessed testamentary capacity on the date he executed the will, this court reversed the judgment allowing the will for probate. [817-821]

PETITION for probate of a will filed in the Norfolk Division of the Probate and Family Court Department on October 16, 2006.

The case was heard by *Christina L. Harms*, J.

*Robert J. O'Regan* for Valerie E. Sullivan.

*Kathleen L. Kane* for Susan W. Paine.

HANLON, J. Valerie E. Sullivan (Valerie) appeals from the decision of a Probate and Family Court judge concluding that the testator, John L. Sullivan (John), possessed testamentary capacity when he executed his last will and testament on June 26, 2004 (will), and also that the will was not the product of undue influence. We agree that the will was not the product of undue influence, but we hold that the petitioner, Susan W. Paine, did not meet her burden of proving the testator had testamentary capacity.

In reviewing issues of testamentary capacity and undue influence, "[i]t is our obligation to review the evidence and reach a

decision in accordance with our own reasoning and understanding, giving due weight to the findings of the trial judge, which we will not reverse unless they are plainly wrong, and finding for ourselves any additional facts we believe to be justified by the evidence." *Palmer* v. *Palmer*, 23 Mass. App. Ct. 245, 249-250 (1986), quoting from *Olsson* v. *Waite*, 373 Mass. 517, 520 (1977). The question, however, "is not what finding we ourselves would have made on the same evidence," but whether we can say the finding of "competence was plainly wrong." *Goddard* v. *Dupree*, 322 Mass. 247, 248 (1948). A finding is not "plainly wrong" unless "the evidence, with every reasonable inference which can be drawn from it, is insufficient to warrant the findings." *Erb* v. *Lee*, 13 Mass. App. Ct. 120, 124 (1982).

With these standards in mind, we set forth the facts in some detail. *Maimonides Sch.* v. *Coles*, 71 Mass. App. Ct. 240, 242 (2008). John was born in May, 1912, and met his wife, Odette, in France when he was stationed there. They married in 1956 and enjoyed a forty-seven-year marriage before Odette died on July 23, 2004, of melanoma. John died in 2006. The couple had no children of their own; they adopted Odette's sister's daughters, Annabelle and Valerie. Annabelle had a falling-out with Odette and John in 1995; she left the home in 1995 and never reconciled with her adoptive parents.

In 1995, John executed a will eliminating Annabelle as a beneficiary and leaving the residuary of his estate to Valerie should Odette predecease him.[1] Valerie remained with John and Odette until 2000 when Valerie was about thirty years old; at that time, Valerie and Odette had a falling-out. The judge found that John allowed Odette to banish Valerie from their home but noted that he continued to sneak telephone calls to her. The judge credited testimony that John was disappointed in Valerie because she had deeply wounded Odette, and that John never forgave Valerie for that even though he continued to love Valerie and miss her. We defer to the judge's findings, based in part on credibility determinations, in this regard.

Odette owned and operated her own beauty salon in Brookline. The overall evidence supported the judge's findings that, at home, Odette was the "boss" and John happily acceded to her

---

[1]Valerie has offered a copy of this will for probate.

wishes in most areas throughout their marriage. In particular, Odette always took the lead on the couple's estate planning.

Odette was diagnosed with melanoma in late 2001. In 2002, she asked the same attorney (attorney) who had drafted the couple's 1995 wills to draft new reciprocal wills for her and John, leaving their estates to one another but, in the event that one predeceased the other, leaving Valerie one dollar and the residuary of their estates to friends of Odette. John executed a will on January 14, 2002, consistent with this request. Paine was named executor of the will if Odette did not survive him. Paula Miller, Odette's assistant for over twenty years and a personal friend of Odette and John, was named as one of the residuary beneficiaries of the will. New wills were executed on February 1, 2003, February 3, 2004,[2] and June 26, 2004, in which minor changes to the residuary beneficiaries were made, but Paine remained the alternate executor. The judge allowed the June 26, 2004, will.

The medical records contained in the record appendix leave little doubt that John suffered from some degree of dementia during the time period that the 2002-2004 wills were executed. A June 25, 2001, neurology note concludes that John had "significant frontal dysfunction with poor insight and judgment, difficulty changing set and mild recent memory difficulties." The neurologist indicated that he discussed with John and Odette that John's insight and judgment difficulties made it difficult for him to appreciate his "gait instability." While there was some suspicion that a vitamin B12 deficiency was the cause of some of his symptoms, a full neuropsychological evaluation was recommended, which John underwent on October 15, 2001. The judge acknowledged the report of the October 15, 2001, evaluation, noting only that it revealed "mild cognitive slowing."

In fact, the history portion of the report of the October 15, 2001, evaluation reflects that Odette had observed some memory impairment over the past three years and more recent word-finding difficulty. The report reflects that before January of 2001, John had managed their financial affairs, but that he had become "confused" about the taxes and thereafter Odette took over the finances. In addition, John was receiving personal care

---

[2]Paine also offered this will for probate.

assistance when his wife was at work. The report further reveals "evidence of significant cognitive impairment. Specifically, testing revealed mild disorientation (time), mild cognitive slowing, moderate anomia, moderate amnesia, and less pervasive frontal lobe deficits." Although it was felt that incompletely treated vitamin B12 deficiency could contribute to some of John's symptoms, the report concluded that a vitamin B12 deficiency did not explain all of them and that the "anomia and amnesia combined with less pronounced deficits in frontal lobe functioning [were] highly suggestive of a diagnosis of Senile Dementia of the Alzheimer's Type (SDAT)." The neuropsychologist concluded that "[u]nless his mental status improves appreciably, [John] will continue to need close supervision. Driving is contraindicated." The medical records do not reflect that John's mental status improved appreciably thereafter.

In July of 2002, John was seen by his primary care physician, and with regard to dementia, he was "strongly encouraged to followup with the neurologist for additional evaluation." There is no evidence that John followed this advice; the next neurology note is in 2004, after his wife died and Valerie was caring for him. When John was seen in the emergency room on June 7, 2003, a week or two after a motor vehicle accident, he was described in a neurosurgery consult as "bright and oriented x 4," and the judge relied on this portion of the note in support of her finding that he had testamentary capacity when the 2004 will was executed. The next sentence of the note stated, however, that "[t]here are obvious gaps in his short-term memory but this is of a chronic nature, as his wife was present during the interview." In addition, the emergency room physician noted that John was able to tell him he was in the hospital, but not which one, and that John was able to identify the month and day of the week, but could not tell him the date or the year. It was further noted that Odette reported "more of a significant problem with some baseline confusion and this was confirmed by . . . his primary care physician."

The medical records reflect that by July 3, 2003, John had a personal care attendant twenty-four hours per day. Notwithstanding his need for twenty-four-hour care, the judge credited a September, 2004, note of his primary care physician that refers

to John's dementia as "mild." The complete statement is that "[t]he patient also has ongoing progressive mild dementia and this has been an ongoing symptom that was first noted in 2001. The patient also had neuropsychological exam and testing in 2001 as well. Progressively, this has been monitored and certainly has noticed . . . increasing forgetfulness." In the assessment and plan section of the note, the doctor states, "Regarding his dementia, the patient will be scheduled to follow up with the neurologist for additional followup evaluations. He will continue with his Zyprexa and continue to have supervision at all times with monitoring of his medications and activities." On August 3, 2004, his primary care physician signed a document saying that John suffered from senile dementia and was unable to live alone. A November 2, 2004, neurology note reflects poor orientation, "poor recall memory, poor working memory and poor visual spatial construction."

The judge essentially adopted the opinion of the proponent's expert, Dr. Barry Roth, who identified medical records that described John's dementia as mild, and noted that medical providers continued to direct their reports to John and explained test results to John, and that John continued to be involved in making treatment decisions for himself. From this evidence, Dr. Roth concluded that "[a]s a physician, the preponderance of evidence indicates that [John] had capacity to know his property, who were the natural heirs to his bounty, that he was in the process of making a will to make distribution with respect to those elements, and that he was in fact making such a plan."

The attorney who drafted all the wills testified that he routinely spoke with Odette about estate planning for her and John. For the wills dated after 2000, he spoke with John only by telephone, and John simply confirmed that he was in accord with the instructions as given by Odette. The attorney did not have any private conversations with John. He did not visit with John. The judge credited the attorney's testimony that he drafted the wills in accordance with John's instructions. The attorney testified, however, that he did not read the wills to John after they were drafted. He mailed the documents to John and Odette, and they took the documents to a local bank for execution. The attorney did not supervise the execution. He could provide no evidence as to John's capacity on the dates the wills were executed.

At trial, the attorney was given a copy of the October, 2001, report of the neuropsychological testing of John. He testified that he had been unaware of that report and the diagnosis of dementia, and that, had he been aware of them, he would have investigated the issue of capacity further and would have requested a medical consultation on testamentary capacity. He would not have drafted the wills without a medical evaluation. He testified he could see from the report that John was impaired and that the report called into question John's independent judgment. Even though the attorney was aware that John had always followed Odette's lead with their estate planning, had he been aware of the 2001 report, he would have consulted a physician. Nonetheless, the judge credited the attorney "with the requisite degree of attention to capacity and free will . . . expected of an attorney drafting a Will for a client." She further credited the attorney's testimony that "he would have never drafted a Will for a client he believed to be mentally incapacitated."

Odette brought John to their local bank to execute the various wills. The bank employees who witnessed the 2002-2004 wills testified that they did not recall the specifics of the executions, but they never saw John appear confused, nor did they think that he was forced to execute the wills. During the executions, they had no discussions with John aside from social niceties.

*Discussion.* 1. *Undue influence.* Valerie argues that the 2002-2004 wills were the product of undue influence exercised by Odette over John. "Four considerations are usually present in a case in which a supportable finding of undue influence has been made. These involve showings that an (1) unnatural disposition has been made (2) by a person susceptible to undue influence to the advantage of someone (3) with an opportunity to exercise undue influence and (4) who in fact has used that opportunity to procure the contested disposition through improper means." *Estate of Moretti,* 69 Mass. App. Ct. 642, 654-655 (2007), quoting from *Heinrich* v. *Silvernail,* 23 Mass. App. Ct. 218, 223 (1986). We have said that "[a] claim of undue influence is made out upon a showing that a third party, here [Odette,] by means of coercion, overpowered the mind of the decedent and caused him to make a will that embodied [Odette's] 'dominating purpose' rather than the 'wishes of the person signing the

instrument,' i.e., the decedent." *Rostanzo* v. *Rostanzo*, 73 Mass. App. Ct. 588, 604 (2009), quoting from *Neill* v. *Brackett*, 234 Mass. 367, 369 (1920). Here, the judge found, and the evidence supports her finding, that with regard to estate planning, John had consistently for many years acceded to Odette's wishes. There was no evidence that coercion was either necessary or exercised with regard to the wills. In fact, the final will added a residuary beneficiary who, as far as the record reveals, was closer to John than Odette. Indeed, given the judge's findings that John acquiesced in banning Valerie from the home, exclusion of her from the will cannot be said to be an unnatural disposition. Moreover, Odette herself did not benefit from the 2002-2004 wills any more than she had in the 1995 will. Looking at the record as a whole, we cannot say the judge was wrong.

2. *Testamentary capacity.* "Where there is some evidence of lack of testamentary capacity, the presumption of sanity loses effect and 'the burden [is] on the proponent of the will to satisfy the tribunal of fact by a fair preponderance of the evidence that the deceased was of sound mind and testamentary capacity when the instrument was executed.' " *Palmer* v. *Palmer*, 23 Mass. App. Ct. at 250, quoting from *Santry* v. *France*, 327 Mass. 174, 176 (1951). "That burden is met by a showing that it is more probable than not that, at the time of execution of the will, . . . 'the testator [was able] to understand and carry in mind, in a general way, the nature and situation of his property and his relations to those persons who would naturally have some claim to his remembrance. It requires freedom from delusion which is the effect of disease or weakness and which might influence the disposition of his property. And it requires ability at the time of execution of the alleged will to comprehend the nature of the act of making a will.' " *Ibid.*, quoting from *Goddard* v. *Dupree*, 322 Mass. 247, 250 (1948). "It is also well settled that in addition to possessing the requisite testamentary capacity and complying with the statutory formalities regarding execution, it must also be shown that the testator knew the contents of the instrument which he signed and executed it with the intention that it operate as his will. The burden of proof on these matters is on the proponent. Here again, he is aided by a presumption that a person signing a written instrument knows

its contents." *Duchesneau* v. *Jaskoviak*, 360 Mass. 730, 733 (1972) (citations omitted).

The evidence presented by Valerie adequately rebuts the presumption of capacity. John exhibited symptoms consistent with the diagnosis of "Senile Dementia of the Alzheimer's Type" at least as early as October of 2001. We are well aware that a diagnosis of Alzheimer's disease in and of itself does not compel a conclusion that a testator lacks capacity to execute a will. The diagnosis carries more weight, however, when the cognitive deficits associated with Alzheimer's disease manifest themselves in the loss of abilities that bear on testamentary capacity. Here, by June of 2001, John's cognitive deficits were such that his poor judgment caused him to be unaware that his gait was unsteady. By October of 2001, driving was deemed contraindicated. He required supervision when his wife was not at home. And, perhaps most importantly, he had lost the ability to handle the family's finances, a task he had always performed. His inability to handle the finances was due to "confusion," not physical weakness. In addition, Valerie offered an expert opinion that John lacked testamentary capacity to execute the 2002-2004 wills. We think this evidence taken together was sufficient to rebut the presumption of testamentary capacity. Compare *O'Rourke* v. *Hunter*, 446 Mass. 814, 827 (2006) (history of delusions that had resolved and ongoing frailty and depression did not rebut the presumption of capacity where testator met with attorney on four occasions and clearly articulated her desires, instructing the attorney how to modify two draft wills before executing the third version).

Paine, the proponent of the will, bore the burden of proving John had testamentary capacity when he executed his 2004 will, unaided by a presumption of testamentary capacity. She failed to meet her burden. Paine offered the testimony of Dr. Roth, who relied on medical notes that referred to John's dementia as "mild" and indicated that physicians continued to direct their reports to him and continued to include him in medical decisions through 2005. Dr. Roth explained that "the reports of the physicians over a long period of time [indicated] that they understood that he was able to take in what they were telling him [and] manipulate it to arrive at a treatment plan in col-

laboration with them where there was informed consent. Meaning, he could take in the information, he could process it, he could work with his health care providers to arrive at a decision in cooperation with them." In addition, Dr. Roth indicated that the records reflect a "fairly mild degree of dementia." From this evidence, Dr. Roth concluded that John possessed testamentary capacity. The judge accepted and adopted Dr. Roth's opinion.

First, it is not at all clear that Dr. Roth's conclusions are supported by careful review of the medical records. In large part, he "cherry picked" portions of the medical records that could suggest John's dementia was mild and ignored contrary medical records. For example, he points to a June 27, 2002, handwritten note by John's primary care physician indicating that John had declined to have further work-up of a suspicious finding on a neck X-ray, "given his advanced age and lack of symptoms," even though he understood it "could indicate both benign and malignant process." This, Dr. Roth concluded, indicates John had a sophisticated, high-level ability to take in information, process it, understand it, and arrive at a reasonable plan. Dr. Roth ignores that, in follow-up two weeks later, further testing *was* performed, calling into question John's original decision. But, even accepting Dr. Roth's interpretation of the physicians' reports as accurate, all that can be said is that with careful explanation by physicians, John retained some ability to process information and assist in reaching a treatment decision. When John executed the 2002-2004 wills, however, there is no evidence that anyone explained his estate planning options to him. There is no evidence that the 2004 will was read to him, or that anyone reviewed his finances with him, or that anyone asked him to identify or reviewed with him the natural objects of his bounty. In these circumstances, his ability to participate in medical decisions, where treatment options were clearly explained, simply does not support the inference that he possessed testamentary capacity in a situation where his options appear not to have been explained to him, and where he was never asked to articulate the choices he was said to be making.

In determining that John had testamentary capacity, the judge credited the attorney with the degree of care and attention

appropriate to the issue of capacity. See *O'Rourke* v. *Hunter*, 446 Mass. at 827. This was plain error. It is true that in circumstances when medical and other evidence call into question a testator's capacity, we have relied on the testimony of the drafting attorney in resolving the testamentary capacity issue. See *Palmer* v. *Palmer*, 23 Mass. App. Ct. at 251-252 & n.5 (attorney who prepared simple, one-page instrument met with testator prior to execution and just prior to execution, summarized each article and put the practical effect in simple layman's language); *Rempelakis* v. *Russell*, 65 Mass. App. Ct. 557, 561-562 (2006) (attorney met with testator in hospital, hand-wrote will according to testator's instructions, and read the will to her in front of witnesses; testator agreed it reflected her wishes before executing it; attorney followed up with formal will and trust and repeated reading and execution formalities); *Maimonides Sch.* v. *Coles*, 71 Mass. App. Ct. at 245-247 (attorney spoke with testator in rehabilitation hospital by telephone and took him through the changes of his second trust amendment, which testator confirmed; testator made additional changes later that day; attorney met with testator at rehabilitation hospital and went through amendment again; testator made additional change and initialed change in the margin and at all times demonstrated to attorney that he knew what he was doing and did not show any confusion).

Here, however, the attorney was unable to provide any relevant evidence as to John's capacity on the date the will was signed. The attorney had not seen John in a number of years and only spoke with him by telephone; John simply verified he wanted what Odette wanted. The attorney was unaware that John had been diagnosed with dementia in 2001. While we agree with the judge that it is very likely that the attorney would not have drafted a will for a client he believed to lack testamentary capacity, the attorney admittedly did nothing to determine whether John understood the will as drafted, knew the natural objects of his bounty, had a general understanding of his finances, or was suffering from any ailment that might influence his dispositions.

It is John's capacity at the time he executed the will that is at issue. The record is virtually barren of any evidence of his capacity when the will was executed except from the witnesses

to the will. The most that can be said of the testimony of the bank employees who witnessed the will is that John did not display any outward evidence of confusion and did not appear forced to execute the will. None of the witnesses recalled the specifics of the execution, however, and none recall inquiring whether John knew he was signing a will, knew his financial holdings, knew the natural objects of his bounty, or otherwise met the testamentary capacity standard. As to the elements of testamentary capacity, the witnesses provided little relevant evidence.

Finally, we are aware that the judge credited testimony that through 2004, John "appeared sharp" to Rex Olson, a friend of John. Olson's conversations with John, however, were limited to small talk, Odette, and their military careers. He described them as "nothing in depth" and did not provide any description of John on or near the date the will was executed.

We are compelled to conclude, therefore, that Paine, as the proponent, failed to meet her burden of proving that John possessed testamentary capacity when he executed the June 26, 2004, will, and reverse the judgment allowing that will for probate. The judge made no findings as to the February 3, 2004, will, also offered by Paine, or the 1995 will, offered by Valerie. Therefore, the matter is remanded to the Probate and Family Court for further proceedings consistent with this opinion.[3]

*So ordered.*

---

[3]We note that the record reflects that the evidentiary failings that cause us to conclude that Paine failed to meet her burden as to John's testamentary capacity to execute the June 26, 2004, will apply also to the February 3, 2004, will.