NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

22-P-21                                        Appeals Court

IN THE MATTER OF THE ESTATE OF JOHN P. URBAN.


No. 22-P-21.

Plymouth.     November 1, 2022. – February 13, 2023.

Present:  Wolohojian, Ditkoff, & Walsh, JJ.


Probate Court, Appeal.  Practice, Civil, Summary judgment,
     Presumptions and burden of proof, Deposition.  Undue
     Influence.  Will, Undue influence, Testamentary capacity,
     Validity.



     Petitions for probate of a will filed in the Plymouth
County Division of the Probate and Family Court Department on
April 1 and July 29, 2019.

     The cases were heard by Edward F. Donnelly, Jr., J., on
motions for summary judgment.


     William F. Spallina for Michelle Finnegan.
     Robert F. Callahan, Jr., for The John P. Urban Scholarship
Fund.


     DITKOFF, J.  Michelle Finnegan appeals from decrees

allowing the petition of the attorney for the decedent, John P.

Urban, to probate Urban's May 3, 2016, will (2016 will), and

dismissing Finnegan's competing petition to probate as a will an

agreement for payment of services dated September 24, 2016.  We conclude that the burden of showing undue influence remains with the objector where, as here, a fiduciary holding a power of attorney does not intrude on the attorney-client relationship with an estate attorney that yields the will.  With that understanding, we conclude that there is no genuine issue of material fact concerning whether the 2016 will, which was produced by independent legal counsel, was the result of undue influence.  We further conclude that there is no genuine issue of material fact whether Urban possessed testamentary capacity when he signed the 2016 will.

Turning to the other issues, we conclude that the judge correctly determined that the summary judgment record showed, as a matter of law, that Finnegan's agreement for payment of services (2016 agreement) (even if it constituted a will) was the product of undue influence.  Finally, concluding that the judge acted within his discretion in striking a transcript of answers by a witness that was obtained outside a deposition with notice to the other parties, we affirm.

1.  <u>Background</u>.  a.  <u>Urban's relationship with Finnegan</u>. "We recite the material facts in the light most favorable to the nonmoving party."  <u>Docos</u> v. <u>John Moriarty & Assocs</u>., 78 Mass. App. Ct. 638, 639 (2011).  In the 1990s, Finnegan moved to Naples, Florida with her parents.  Shortly thereafter, she was

introduced to Urban, at the time in his mid-seventies.  For nearly twenty years, Urban lived in a guest house behind Finnegan's parents' home during the winter months and spent the rest of the year in Massachusetts.

For many years, Finnegan maintained a close relationship with Urban, who would die without a surviving spouse, descendants, siblings, or siblings' descendants.  Urban frequently ate meals with the Finnegans and went to classical music concerts with Finnegan's parents.  Urban regularly went to church with the Finnegans and joined Finnegan's uncle for Christmas dinner.

b.  <u>The wills</u>.  Prior to the execution of the 2016 will, Urban signed three similar wills.  Their manner of drafting and execution is important to understanding the issues here.

Urban, his close friend, Dr. Geoff Emerson,[1] and Attorney Daniel Singleton were all members of the Cohasset Golf Club.  In 2012, while Dr. Emerson was present, Urban expressed to Attorney Singleton that he "needed to make a will."  Attorney Singleton made an appointment to meet with Urban.

---

[1] Although Attorney Singleton and Dr. Emerson were acquaintances, Attorney Singleton and his wife "never socialized with Dr. and Mrs. Emerson."  Attorney Singleton did not perform any legal work for the Emersons until after Urban died.

At some point in 2012 or 2013, Dr. Emerson drove Urban to Attorney Singleton's office, but Attorney Singleton and Urban met alone, whereupon Urban "went through a whole list of people who . . . he wanted to leave money to." On June 19, 2013,[2] Dr. Emerson drove Urban to Attorney Singleton's office, and then Urban met privately with Attorney Singleton to review the will. Urban executed the will; two people who worked in Attorney Singleton's office building served as disinterested witnesses. The will provided for sixteen beneficiaries, including Finnegan and her parents and sister, Dr. Emerson and his wife, Middlebury College, and the John P. Urban Scholarship Fund (scholarship fund), to be created upon Urban's death for the purpose of providing scholarships to local high school students for college expenses.

In 2014, Urban was diagnosed with dementia. That same year, Dr. Emerson called Attorney Singleton and indicated that Urban wished to change his will. Attorney Singleton called Urban to discuss revisions and then drafted a new will. The 2014 will was substantially similar to the 2013 will with the following key changes: Urban reduced Finnegan's bequest from $375,000 to $225,000 while increasing the bequest to each of Finnegan's parents from $180,000 to $325,000, increased

---

[2] By this point, Urban had appointed Dr. Emerson to serve as his health care proxy.

Dr. Emerson's bequest from $375,000 to $800,000, increased Mrs. Emerson's bequest from $225,000 to $400,000, and added a bequest to the Cohasset Golf Club. On June 6, 2014, Dr. Emerson drove Urban to Attorney Singleton's office. Attorney Singleton and Urban met privately to review the will. Dr. Emerson was not present when Urban signed the will. Two disinterested persons who worked in Attorney Singleton's office building witnessed Urban execute his will. Two months later, in August 2014, Urban executed a durable power of attorney and appointed Dr. Emerson to that role.

In the spring of 2015, Attorney Singleton drafted a third will in response to Urban's request to revise his will. Given that the scholarship fund had now been formed and Dr. Emerson was a trustee, Urban removed Dr. Emerson as his personal representative and appointed Attorney Singleton instead. Finnegan's bequest was unchanged, her parents' bequests were each reduced from $325,000 to $300,000, Dr. Emerson's bequest was increased from $800,000 to $900,000, and Mrs. Emerson's bequest was increased from $400,000 to $450,000. On May 5, 2015, Dr. Emerson drove Urban to Attorney Singleton's office. Urban met with Attorney Singleton privately in his office to

review the will.  In the presence of two disinterested witnesses,[3] Urban executed this will.

In the spring of 2016, Dr. Emerson called Attorney Singleton and indicated that Urban wanted to double the bequest to Middlebury College from $150,000 to $300,000.[4]  Based on this information, but without first speaking with Urban, Attorney Singleton drafted a new will for Urban.  On May 3, 2016, Urban's caregiver drove Urban from the nursing home where he was living at the time to Attorney Singleton's office.  Urban's caregiver reported that "[a]ll morning long, and throughout the time [she] was with him that day, Mr. Urban was clear headed and focused." Because of Urban's limited mobility, Urban and Attorney Singleton met privately in the parking lot behind Attorney Singleton's office to discuss the revised will.  Attorney Singleton observed that "Urban immediately recognized [him]." In speaking with Urban, Attorney Singleton noticed that Urban was "alert and focused."  Attorney Singleton discussed the increased bequest to Middlebury College and Urban approved that revision.  When Urban executed the 2016 will, Attorney Singleton

---

[3] One was Attorney Singleton's wife; the other worked in Attorney Singleton's office building.

[4] Middlebury College attested that it "was not aware of the $300,000 bequest that Mr. Urban made to Middlebury in the Will until after Mr. Urban's death, when Middlebury received notice that the Will had been offered for probate."

"assessed Mr. Urban's testamentary capacity and concluded that that Mr. Urban had testamentary capacity. . . . Mr. Urban knew what he owned, knew who the natural objects of his bounty were and knew that he was making his will." Two disinterested individuals who worked in Attorney Singleton's office building witnessed Urban execute his will. Both witnesses signed an "Affidavit to Due Execution of Will" attesting, among other things, that Urban was "of sound mind and under no constraint or undue influence." Finnegan was not present when Urban executed his 2016 will and had not seen him in over a year.

c. The 2016 agreement. In April 2014, Finnegan contacted her attorney to complain about Urban's friends, to express concerns about "being taken advantage of," and to ask for advice on "legally how to protect [her]self." In response, her attorney offered to "draft[] a legal document that allows [Finnegan] to make decisions on [Urban's] behalf and also be 'reimbursed' for [her] time and care."

In September 2016, Finnegan traveled from Florida to Massachusetts to visit Urban at the nursing home. She brought a three-page document entitled "Agreement by Parties." The document stated that the parties "acknowledged that over the course of the last approximately 20 years, [Urban] has not paid [Finnegan] for the care giving she provided for him while he was living in Florida." The 2016 agreement provided:

> "Finnegan shall be exclusive beneficiary and Personal Representative to the estate of John Urban upon his death and for [Finnegan] to distribute the appropriate amounts that [Urban] had previously instructed to Middlebury, Northfield Mount Hermon,[5] DKE,[6] Essential Art[7] . . . and to keep so she shall remain in the lifestyle she had become accustomed while [Urban] lived with her."

The agreement also provided that Urban's "house is to be transferred into [Finnegan's] name for her to do as she wishes and believes [Urban] would like."

Finnegan presented the 2016 agreement to Urban. She admitted that this was the first time that Urban had seen it in its entirety. Finnegan testified that, when she presented the agreement to Urban, he "at least looked at it, but [she] d[id]n't know now if he was able to read it" or whether she read it out loud to Urban at the time. The 2016 agreement expressly stated that Finnegan and Urban agreed that Finnegan would "be [the] exclusive beneficiary and Personal Representative to the estate of John Urban upon his death . . . [and that it] revok[ed] all former wills by [Urban] at any time." The agreement was signed by Finnegan, Urban, and two witnesses. One

---

[5] Northfield Mount Hermon is a private boarding school attended by Urban, to which Urban left $150,000 in his will.

[6] Presumably, the acronym stands for the Delta Kappa Epsilon fraternity. The record reflects that Urban was a fraternity brother at Middlebury.

[7] The reference is to a nonprofit organization founded and controlled by Finnegan.

witness was Finnegan's father, who was deceased at the time of these proceedings. The other witness had also lived in a guest house on the Finnegan estate and attested that she "only vaguely remembered" the signing. She did recall that Urban stated "he trusted [Finnegan] to take care of everything." Shortly after, Finnegan left Massachusetts.

d. Procedural background. In February 2019, Urban died from Alzheimer's dementia at the age of ninety-seven. On April 1, 2019, Attorney Singleton filed a petition in the Probate and Family Court to probate Urban's 2016 will and to be appointed as personal representative, in accordance with the 2016 will. In June 2019, Finnegan filed an affidavit objecting to Attorney Singleton's petition[8] as well as a notice of claim for five million dollars against Urban's estate.[9] A month later, Finnegan filed a petition in the Probate and Family Court to probate the 2016 agreement. In September 2019, eleven beneficiaries under

---

[8] Because the 2016 will contains an in terrorem clause, Finnegan's litigation forfeits her bequest. See Savage v. Oliszczak, 77 Mass. App. Ct. 145, 147 (2010).

[9] In January 2020, Finnegan filed a complaint in the Superior Court against the estate, seeking five million dollars in damages for services rendered to Urban. In April 2022, after a hearing on the motion, a judge allowed the estate's motion for summary judgment. The judge ruled that Finnegan "is not entitled to quantum meruit based on the undisputed material facts" and that Finnegan could not recover in equity because "she has acted in bad faith." Moreover, the judge ruled that Finnegan's "claims are barred by the doctrine of res judicata." No appeal was filed.

the 2016 will, including the scholarship fund, objected to Finnegan's petition.

In July 2020, the scholarship fund filed a motion for summary judgment regarding both the 2016 will and the 2016 agreement.  In February 2021, the judge allowed the scholarship fund's motions for summary judgment.  Regarding the 2016 agreement, the judge found that there was no genuine dispute of material fact that it was the product of undue influence and dismissed with prejudice Finnegan's petition to probate it.  Regarding the 2016 will, the judge found that there was no genuine dispute of material fact that Urban possessed testamentary capacity when he executed the 2016 will and that it was not procured by undue influence.  A decree entered admitting the 2016 will to probate as "the Decedent's last will" and appointing Attorney Singleton as personal representative.  This appeal followed.

2.  Standard of review.  In evaluating the allowance of a motion for summary judgment, "we review de novo whether there were genuine issues of material fact."  Cellco Partnership v. Peabody, 98 Mass. App. Ct. 496, 500 (2020).  We ask "whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to judgment as a matter of law."  Molina v. State Garden, Inc., 88 Mass. App. Ct. 173, 177 (2015),

quoting Augat, Inc. v. Liberty Mut. Ins. Co., 410 Mass. 117, 120 (1991). "While we examine the record in its light most favorable to the nonmoving party, . . . '[c]onclusory statements, general denials, and factual allegations not based on personal knowledge [are] insufficient to avoid summary judgment.'" O'Rourke v. Hunter, 446 Mass. 814, 821 (2006), quoting Cullen Enters., Inc. v. Massachusetts Prop. Ins. Underwriting Ass'n, 399 Mass. 886, 890 (1987).

3. The 2016 will. a. Undue influence. "To prove undue influence, a contestant must show 'that an (1) unnatural disposition has been made (2) by a person susceptible to undue influence to the advantage of someone (3) with an opportunity to exercise undue influence and (4) who in fact has used that opportunity to procure the contested disposition through improper means.'" Maimonides Sch. v. Coles, 71 Mass. App. Ct. 240, 255-256 (2008), quoting O'Rourke, 446 Mass. at 828. "In a will contest involving allegations of undue influence, the burden of proof ordinarily rests with the party contesting the will." Germain v. Girard, 72 Mass App. Ct. 409, 412 (2008), quoting Matter of the Estate of Moretti, 69 Mass. App. Ct. 642, 651 (2007). "However, in cases involving a fiduciary, 'the fiduciary who benefits in a transaction with the person for whom he is a fiduciary bears the burden of establishing that the transaction did not violate his obligations.'" Germain, supra

at 412-413, quoting Cleary v. Cleary, 427 Mass. 286, 295 (1998).
"[T]he burden of proving the absence of undue influence shifts
to the fiduciary only where he has actually taken part in the
questioned transaction." Rempelakis v. Russell, 65 Mass. App.
Ct. 557, 563 (2006).

Finnegan does not challenge the probate judge's conclusion
that the summary judgment record demonstrates that she would be
unable to meet the burden of showing undue influence at trial.
Rather, she argues that she would not have borne that burden.
She contends that, because Dr. Emerson was Urban's power of
attorney and a beneficiary of the will, the Emersons and the
scholarship fund (of which the Emersons are trustees) would have
the burden at trial to show the absence of undue influence and
that, on summary judgment, the Emersons and the scholarship fund
failed to demonstrate an absence of genuine disputed fact on
that point.[10]  See Arcidi v. National Ass'n of Government
Employees, Inc., 447 Mass. 616, 619 (2006) ("The moving party
has the burden of demonstrating affirmatively the absence of a
genuine issue of material fact on every relevant issue,
regardless of who would have the burden on that issue at
trial").  We disagree.

---

[10] Where this would leave us as to the fourteen
beneficiaries of the will who are not Dr. Emerson, his wife, or
the scholarship fund, see Germain, 72 Mass. App. Ct. at 413, is
a quandary that, thankfully, we do not reach.

The burden-shifting rule "applies not just to the drafter of estate planning documents," but also to "one who serves as a fiduciary under a power of attorney; was fully involved in all the undertakings relative to the revisions of the testator's will and estate plan, yielding the beneficial inheritance; and exercised unrestricted and expansive power over the testator's finances." Matter of the Estate of Moretti, 69 Mass. App. Ct. at 643. The burden to show the absence of undue influence "is generally met if the fiduciary shows that his principal made the bequest . . . with the advice of independent legal counsel." Cleary, 427 Mass. at 291. The advice of independent legal counsel, however, is ineffective where the fiduciary "was an intruder into the relationship between the attorneys and the testator, and engaged in acts which, in effect, subverted the independence of the legal representation." Matter of the Estate of Moretti, supra at 644.

Here, there is no evidence that Dr. Emerson intruded on the attorney-client relationship between Urban and Attorney Singleton. Although Dr. Emerson drove Urban to Attorney Singleton's office in 2013, 2014, and 2015, he did not drive the legal relationship between Urban and Attorney Singleton. Cf. Matter of the Estate of Sharis, 83 Mass. App. Ct. 839, 843 (2013) (decedent "lacked the advice of independent counsel [where] . . . . Spinelli selected the attorney, communicated

with the drafting attorney by e-mail, filled in certain terms, and transported [decedent] to her husband's nursing home for the execution of her will. . . . No attorney reviewed the terms of the will with [decedent]. Only Spinelli did so. Significantly, the decedent had no prior wills"). Unlike in Matter of the Estate of Moretti, where the fiduciary "played a substantial role in the drafting process," 69 Mass. App. Ct. at 654, Dr. Emerson did not. Attorney Singleton attested that, when he discussed estate planning with Urban, "Dr. Emerson was never present." Likewise, each time Urban executed his will -- in 2013, 2014, 2015, and 2016 -- Dr. Emerson was not present.

Although Dr. Emerson called Attorney Singleton in 2016 regarding Urban's request to revise his will, doing so was not to Dr. Emerson's advantage. Increasing the bequest to Middlebury College in the 2016 will had no effect on the bequests to Dr. Emerson or his wife and in fact reduced the bequest to the scholarship fund, which was to receive "the rest and residue" of Urban's estate.[11] Even though Dr. Emerson spoke with Attorney Singleton first, Urban agreed to this revision after meeting privately with Attorney Singleton. Accordingly, the summary judgment record did not raise a triable issue of

---

[11] Although Attorney Singleton helped to create the scholarship fund, which named the Emersons as trustees, "Urban was either present or gave express approval for any course of action while he was alive."

fact either that Dr. Emerson actually took part in the questioned transaction or that the 2016 will was the product of undue influence.  See Rempelakis, 65 Mass. App. Ct. at 563, 567 (burden of proof never shifted where "Russell took no meaningful part in the decedent's decision to supersede her 1988 will in favor of a new disposition that benefitted Russell and his family").  Cf. Matter of the Estate of Sharis, 83 Mass App. Ct. at 842 (decedent's fiduciary held "power of attorney . . . [with] near complete control of [decedent's] finances, and played an instrumental role in arranging for the will to be drafted and executed.  It was therefore his burden to prove that the will was not the product of his undue influence").  Similarly, the existence of truly independent legal counsel would preclude a finding of undue influence in these circumstances.

b.  Testamentary capacity.  Testamentary capacity "requires freedom from delusion which is the effect of disease or weakness and which might influence the disposition of [the testator's] property" and the "ability at the time of execution of the alleged will to comprehend the nature of the act of making a will."  Paine v. Sullivan, 79 Mass. App. Ct. 811, 817 (2011), quoting Palmer v. Palmer, 23 Mass. App. Ct. 245, 250 (1986).  "[T]o determine testamentary capacity, '[t]he critical question is whether the testator was of sound mind at the time the will

was executed. It has been held that, 'a person . . . may possess testamentary capacity at any given time and lack it at all other times.'" Matter of the Estate of Rosen, 86 Mass. App. Ct. 793, 798 (2014), quoting O'Rourke, 446 Mass. at 827. "Whether a testator had testamentary capacity is a question of fact." Matter of the Estate of Galatis, 88 Mass. App. Ct. 273, 278 (2015). See Rempelakis, 65 Mass. App. Ct. at 563 (will proponent "has the burden of proving that the decedent had testamentary capacity at the time of her execution of the instrument").

Here, there is no genuine dispute of material fact that Urban possessed testamentary capacity when he executed the 2016 will. See Haddad v. Haddad, 99 Mass. App. Ct. 59, 69 (2021) ("There was no direct evidence to rebut the presumption [of testamentary capacity] with respect to July 12, 2011, the day [testator] executed his new estate documents"). Urban's caregiver attested that, on the day she drove Urban to Attorney Singleton's office to execute the 2016 will, "Mr. Urban was clear headed and focused. . . . Mr. Urban immediately recognized Attorney Singleton." She further attested that "Mr. Urban was neither delusional nor confused." Likewise, Attorney Singleton attested that, when Urban arrived at his office to execute the will, "Urban immediately recognized [him] . . . . [and] was alert and focused." After assessing Urban's

testamentary capacity, Attorney Singleton determined that Urban possessed testamentary capacity.  Each disinterested witness attested that, when Urban arrived at Attorney Singleton's office to execute his will, he "remembered [the witness] from the previous times when [the witness] served as a witness for him." When Urban executed his 2016 will, both witnesses signed an "Affidavit to Due Execution of Will" where they "declare[d] that [they] believe[d] this Testator to be of sound mind and memory." Similarly, both witnesses attested that "Mr. Urban was alert and focused when [they] spoke on May 3, 2016 . . . . [and] appeared to be of sound mind."

In contrast, Finnegan was unable to testify to Urban's testamentary capacity at the time he signed the 2016 will prepared by Attorney Singleton because she had not seen him in over a year.  To be sure, Urban suffered from dementia, and we do not doubt that a person might be so far afflicted that medical records could demonstrate that he could not have had testamentary capacity at the relevant time.  Here, however, the medical records do not reflect this stage of the disease. Rather, records from April 1, 2016, reflect that, when Urban was sent to the hospital with enzyme issues, he was "confused." When assessed, apparently at the nursing home, three days after the will signing, he had "self-feeding difficulty."  Given the variable nature of dementia, these records do not overcome the

specific testimony regarding Urban's condition on May 3, 2016, and thus do not create a genuine issue of material fact. See Haddad, 99 Mass. App. Ct. at 69-70 ("the presumption can be rebutted by evidence that a testator was delusional, incompetent, or confused in the days leading up to the making of a will"); Matter of the Estate of Rosen, 86 Mass. App. Ct. at 799 ("the contestant's evidence is insufficient to defeat the presumption that the testator had the requisite testamentary capacity to execute his [will]"). This was not a case where "the cognitive deficits associated with Alzheimer's disease manifest[ed] themselves in the loss of abilities that bear on testamentary capacity." Paine, 79 Mass. App. Ct. at 818.

c. Urban signing the 2016 will. Finnegan asserts that Urban never signed the 2016 will. The will is notarized, and Attorney Singleton, both disinterested witnesses, and the caregiver each attested or testified that Urban signed the will. To counter this evidence, Finnegan cites to an affidavit of the keeper of records at the nursing home where Urban was living stating that the nursing home has no record that Urban left the premises on May 3, 2016. Finnegan, however, ignores the keeper's second affidavit, which states the following:

> "[I]n May of 2016, visitors who took patients out of the building were supposed to voluntarily inform the nursing staff [that] the patient was leaving the home. No employee at the Nursing Home was assigned to enforce our policy . . . . The Nursing Home was dependent on the visitors to

> report the patient's trip to the staff.  It is possible
> that patient trips occurred without any evidence of the
> trip in the facility records."

Contrary to Finnegan's assertion, the affidavits indicate that Urban could have left the nursing home to execute the 2016 will without the nursing home's having any record of him doing so. Finnegan did not present any evidence to suggest otherwise. Accordingly, there was no genuine dispute of material fact whether Urban signed the 2016 will.  See O'Rourke, 446 Mass. at 815-816.

4.  The 2016 agreement.  In the absence of a fiduciary relationship, "a party challenging a will or other document on the ground that it was procured through fraud or undue influence bears the burden of proving the allegation by a preponderance of the evidence."  Rostanzo v. Rostanzo, 73 Mass. App. Ct. 588, 604 (2009).  As stated, undue influence requires a showing that "an (1) unnatural disposition has been made (2) by a person susceptible to undue influence to the advantage of someone (3) with an opportunity to exercise undue influence and (4) who in fact has used that opportunity to procure the contested disposition through improper means."  Maimonides Sch., 71 Mass. App. Ct. at 255-256, quoting O'Rourke, 446 Mass. at 828.  "Any species of coercion, whether physical, mental or moral, which subverts the sound judgment and genuine desire of the individual, is enough to constitute undue influence."  Matter of

the Estate of Sharis, 83 Mass. App. at 842, quoting Neill v. Brackett, 234 Mass. 367, 369, (1920).  Finnegan disputes only whether the 2016 agreement constituted an unnatural disposition.[12]

Here, the summary judgment record demonstrates that there is no genuine issue of material fact that the 2016 agreement constituted an unnatural disposition.  See O'Rourke, 446 Mass. at 828 ("there is no suggestion in the record of an unnatural disposition").  Between 2013 and 2016, Urban executed four wills, all of which were drafted by Attorney Singleton, provided for multiple beneficiaries (including Finnegan and her parents and sister), and left "the rest and residue to the John P. Urban Scholarship Fund."  Significantly, unlike the 2015 and 2016 wills, which listed eighteen and seventeen beneficiaries, respectively, the 2016 agreement left Urban's entire estate to a sole beneficiary, Finnegan.  The uncontradicted evidence, however, established that Urban "was extremely proud of his idea to establish the Scholarship Fund," that "he was happy to give money to Mount Hermon and Middlebury College," and that "[he] was a very social person" who had several close friends.

Finnegan, by contrast, was one of Urban's many friends and had visited him in Massachusetts only once or twice before

---

[12] Finnegan correctly does not dispute the other elements of undue influence.

presenting him with the agreement. Even when Urban was living part-time in Florida, Finnegan complained to her attorney about Urban's refusal to give her money and his "'control games' [that she] really can barely tolerate these days." Although "the law respects the choices of the competent testator" and "does not overrule them for reasons of questionable wisdom or social utility," Maimonides Sch., 71 Mass. App. Ct. at 256, absent any evidence of a falling out with the other potential beneficiaries, the 2016 agreement constitutes an unnatural disposition.[13] See Hernon v. Hernon, 74 Mass. App. Ct. 492, 498 (2009) (where "the testator had always expressed his intent to split his estate evenly between both Peter's and Stephen's children," "exclusion of his nephews Nicholas and Patrick . . . made the disposition unnatural on the whole").

5. Motion to strike. On March 6, 2020, Finnegan's attorney noticed the March 20, 2020, deposition of Barbara Cannon, a licensed social worker and owner of a geriatric care

---

[13] Because of this conclusion, we need not reach the question whether the 2016 agreement is a will. To be sure, the agreement is "in writing," "signed by the testator," and "signed by at least 2 individuals, each of whom witnessed . . . the signing." G. L. c. 190B, § 2-502 (a). We note, however, that the mere compliance with these formalities does not make the agreement a will. Rather, the putative testator must "execute it with the requisite testamentary intent." Duchesneau v. Jaskoviak, 360 Mass. 730, 733 (1972). Cf. G. L. c. 190B, § 2-502 (b) ("Intent that the document constitute the testator's will can be established by extrinsic evidence").

management practice. On March 18, 2020, the parties agreed to cancel the Cannon deposition. Two days later, Finnegan's attorney questioned Cannon under oath without providing notice to opposing counsel. See Mass. R. Civ. P. 30 (b) (1), as appearing in 489 Mass. 1401 (2022) ("A party who wants to depose a person by oral questions must give written notice to every other party at least 7 days before"). In July 2020, Finnegan attached a transcript of the questioning to her opposition to the scholarship fund's motion for summary judgment. The scholarship fund promptly moved to strike Cannon's statement. The judge ultimately allowed the motion to strike.

We review a judge's allowance of a motion to strike for an abuse of discretion. See Saxonis v. Lynn, 62 Mass. App. Ct. 916, 917 (2004), cert. denied, 546 U.S. 819 (2005). "An abuse of discretion occurs only where the judge makes a clear error of judgment in weighing the factors relevant to the decision . . . such that the decision falls outside the range of reasonable alternatives." Barbetti v. Stempniewicz, 490 Mass. 98, 105 (2022), quoting District Attorney for the N. Dist. v. Superior Court Dep't, 482 Mass. 336, 342 (2019).

Here, the judge acted within his discretion in striking the Cannon statement from the summary judgment record. The judge found that "[t]he e mail exchange appended to that motion warrants a conclusion that counsel agreed on March 18, 2020 to

cancel the [Cannon] deposition. . . .  The statement under oath is replete with hearsay and contains more than a few leading questions. . . .  This was a deposition in everything but name."

We discern no error.  The statement consists of thirty-three pages of transcription of Finnegan's counsel asking questions of Cannon under oath.  The transcribed questions and answers present exactly like a deposition transcript, except for the absence of opposing counsel and the corresponding absence of stipulations, objections, and cross-examination.  See Anselmo v. Reback, 400 Mass. 865, 868-869 (1987) (one-party deposition inadmissible as "declaration of a deceased person" under G. L. c. 233, § 65, because it "unfairly denied an opportunity to cross-examine when such an opportunity could readily have been afforded").

A motion for summary judgment, or opposition thereto, may be supported by "affidavits . . . made on personal knowledge" and may be "supplemented or opposed by depositions, answers to interrogatories, or further affidavits."  Mass. R. Civ. P. 56 (e), 365 Mass. 824 (1974).  See Kourouvacilis v. General Motors Corp., 410 Mass. 706, 713-714 (1991).  Accord Geller v. Allied-Lyons PLC, 42 Mass. App. Ct. 120, 125 n.8 (1997) (nonmoving party with burden of proof at trial must "designate by affidavits or by depositions, answers to interrogatories, or admissions on file specific facts showing that there is a

genuine issue for trial").[14]  Nothing in the rule allows for the submission, for summary judgment purposes, of a transcribed interview outside the context of a deposition, to which opposing counsel is entitled to notice and the opportunity to attend and cross-examine.  See Mass. R. Civ. P. 30 (b), (c).

To be sure, Finnegan could have submitted an affidavit signed by Cannon as part of the summary judgment record.[15]  A signed affidavit and a transcript of answers under oath are different creatures.  Had Finnegan presented Cannon with an affidavit, she would have had the opportunity to consider carefully the information therein, to direct what information would be included or not included in the affidavit, and to research any information of which she was uncertain before signing.

A transcribed examination, by contrast, has its advantages of the formality of a court reporter, the spontaneity of the responses, and the opportunity for follow-up questions.  In the

---

[14] A party encountering difficulty obtaining an affidavit must "make the tactical decision whether to seek a continuance 'to permit affidavits to be obtained or depositions to be taken or discovery to be had.'"  Matter of the Estate of Nevers, 100 Mass. App. Ct. 861, 868 n.5 (2022), quoting Mass. R. Civ. P. 56 (f), 365 Mass. 824 (1965).

[15] The hearsay provided, however, would have been "unacceptable to defeat summary judgment," even if presented in an affidavit.  Locator Servs. Group, Ltd. v. Treasurer & Receiver Gen., 443 Mass. 837, 865 (2005), quoting Madsen v. Erwin, 395 Mass. 715, 721 (1985).

context of a deposition, it also allows for cross-examination by opposing counsel and intervention, if appropriate, by counsel for the witness. See Mass. R. Civ. P. 30 (c). It does not, however, share the qualities of an affidavit. Finnegan's claim on appeal that the Cannon statement "was the same thing as an affidavit" is without merit. Accordingly, the judge acted within his discretion in striking the Cannon statement from the summary judgment record.

<u>Decrees affirmed</u>.